

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-10-2001

# Westmoreland Human v. Walsh

Precedential or Non-Precedential:

Docket 00-3070

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Westmoreland Human v. Walsh" (2001). *2001 Decisions.* Paper 71.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/71

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 10, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3070

WESTMORELAND HUMAN OPPORTUNITIES, INC.,
Appellant

v.

JAMES R. WALSH, Trustee of the Bankruptcy Estate of
Life Service Systems, Inc.; LIFE SERVICE SYSTEMS, INC.

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civ. No. 99-cv-00110)
District Judge: Honorable D. Brooks Smith

Argued: October 25, 2000

Before: BECKER, Chief Judge, SCIRICA and
FUENTES, Circuit Judges.

(Filed April 10, 2001)

        DANIEL B. PAGLIARI, ESQUIRE
         (ARGUED)
        Pagletta & Pagliari, LLP
        2773 Leechburg Road
        Lower Burrell, PA 15068-3138

        Counsel for Appellant

JAMES R. WALSH, ESQUIRE
 (ARGUED)
Spence, Custer, Sayler, Wolfe,
 and Rose
400 U.S. Bank Building
P.O. Box 280
Johnstown, PA 15907

Counsel for Appellee

DAVID W. OGDEN, ESQUIRE
Assistant Attorney General
United States Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

HARRY LITMAN, ESQUIRE
United States Attorney
633 U.S. Post Office & Courthouse
Pittsburgh, PA 15219

WILLIAM KANTER, ESQUIRE
H. TYOMAS BYRON, III, ESQUIRE
Attorneys, Appellate Staff
Civil Division, PHB Room 9102
Department of Justice
601 D Street, N.W.
Washington, DC 20530-0001

CAROLE W. WILSON, ESQUIRE
Associate General Counsel
ANGELO AIOSA, ESQUIRE
Assistant General Counsel
BATINA R. WILLS, ESQUIRE
Trial Attorney
Department of Housing and Urban
 Development
451 7th Street, S.W., Room 10258
Washington, DC 20410

Counsel for United States of America
as Amicus Curiae

2

OPINION OF THE COURT

BECKER, Chief Judge.

This bankruptcy appeal requires us to define the boundaries of the term "property of the estate," as used in S 541 of Title 11 of the United States Code (Bankruptcy Code), in the context of a federal grant relationship. The appeal arises out of an adversary action instituted by the trustee of debtor Life Service Systems, Inc. (LSS) against defendant Westmoreland Human Opportunities, Inc. (WHO), charging the latter with a breach of itsfiduciary duty to LSS's Unsecured Creditors Committee (Committee). Both LSS and WHO are non-profit organizations which provide community services to residents of Westmoreland County in western Pennsylvania.

In 1995, LSS was selected by the Department of Housing and Urban Development (HUD) to receive grant moneys under the federal Supportive Housing Program; LSS and HUD executed a Supportive Housing Grant Agreement (Grant Agreement) as part of this grantor/grantee arrangement. Shortly thereafter, LSS experienced significant financial difficulties, ultimatelyfiling a Chapter 11 bankruptcy petition. Because WHO was one of LSS's largest creditors, it accepted an invitation to join the Unsecured Creditors Committee.

During its tenure on the Committee, WHO, without notifying either its fellow Committee members or the Bankruptcy Court, assumed LSS's position as r ecipient of Supportive Housing Program funds, executing a Supportive Housing Grant Agreement Amendment (Grant Agr eement Amendment) with HUD. In the adversary action at issue on this appeal, LSS's trustee in bankruptcy alleged that WHO, by assuming LSS's interest in the grant r elationship in this manner, breached its fiduciary duty to Committee constituents. WHO defended on the ground that LSS's interest in the Supportive Housing Program grant relationship was not property of LSS's bankruptcy estate and thus did not trigger a fiduciary duty on WHO's part. The Bankruptcy Court rejected WHO's defense, holding that

3

LSS's interest in the grant relationship constituted part of LSS's bankruptcy estate and that WHO had ther efore violated its fiduciary obligations. It enter ed judgment against WHO in the sum of $135,653. On appeal, the District Court affirmed.

Against this background, WHO's appeal pr esents the question whether a debtor non-profit community service organization's interest in a HUD-type federal grant relationship constitutes property of the debtor's estate. Disagreeing with the Bankruptcy and District Courts, we hold that LSS's interest in the grant r elationship with HUD is excluded from the definition of "pr operty of the estate" set forth in S 541 of the Bankruptcy Code. Despite S 541's considerable breadth, HUD's singular supervisory interest in ensuring the effective administration of the Supportive Housing Program, evidenced by the pervasive, strict, and minute oversight over the grant relationship imposed by the Program's relevant statutory and r egulatory provisions, suffices to exclude LSS's interest in the Supportive Housing Program grant relationship from S 541's property definition. The District Court, in conducting its S 541 pr operty analysis, failed to account for HUD's weighty inter est. The court mistakenly viewed the provisions of the Grant Agreement as the exclusive calipers for measuring the rights yielded to LSS by virtue of the grant r elationship, and therefore neglected to consider the substantial limitations imposed on those rights by the other statutory and regulatory components of the Supportive Housing Program scheme. As a result, we conclude that the District Court erred in deciding that LSS's inter est in the grant relationship constituted property of its bankruptcy estate, and we therefore set aside the court's judgment.

However, our conclusion that LSS's inter est does not qualify as property for purposes of the Bankruptcy Code does not dispose of this appeal. Left unanswer ed is a question not considered by either the Bankruptcy or the District Court: whether, despite the fact that LSS's interest in the grant relationship with HUD was not pr operty of its bankruptcy estate, WHO's assumption of LSS's inter est without notice to Committee members or to the Bankruptcy Court violated the fiduciary duty WHO owed to Committee

4

constituents. The Bankruptcy and District Courts, as well as the parties themselves, all appear to have assumed that resolution of the bankruptcy property question would also dispose of the breach of fiduciary duty issue. Because neither the District nor the Bankruptcy Court addr essed the issue that our disposition of the case now raises, relying instead on the erroneous conclusion that LSS's interest qualified as property for purposes of the Bankruptcy Code, and because the parties failed to adequately brief and argue the question to us, we remand the case to the District Court, which may in tur n refer it to the Bankruptcy Court, for resolution of the issue.

I. Facts and Procedural History

A.

In 1995, LSS, a private non-profit community service organization operating in western Pennsylvania, undertook a project to provide supportive housing assistance to homeless families in Westmoreland County. LSS planned to purchase and refurbish two small apartment buildings, which it would then use to provide those families with transitional housing. As the name suggests, transitional housing is not intended to furnish homeless families with a permanent residence, but rather is designed to supply recipients with temporary shelter while they seek permanent housing and learn basic life skills necessary for independent living.[1] LSS's pr oject was to house some twenty families with children, and would have provided supportive services, including job training and placement, day care, adult education, and instruction in daily life skills such as nutrition and budgeting.

As its primary source of funding for the pr oject, LSS turned to HUD, seeking moneys from HUD's Supportive Housing Program. The purpose of this Pr ogram "is to

───────────────────────────────────────────

1. Section 11384(b) of the Stewart B. McKinney Homeless Assistance Act defines "transitional housing" as "housing the purpose of which is to facilitate the movement of homeless individuals and families to permanent housing within 24 months." 42 U.S.C. S 11384(b).

5

promote the development of supportive housing and supportive services, including innovative appr oaches to assist homeless persons in the transition fr om homelessness, and to promote the provision of supportive housing to homeless persons to enable them to live as independently as possible." 42 U.S.C. S 11381. The Supportive Housing Program facilitates this public purpose by furnishing federal moneys to qualified HUD-selected applicants, who are to use the funds for several types of housing-related activities, including acquisition and/or rehabilitation of existing structures, construction of new structures, leasing of existing structur es, and provision of supportive services for transitional housing r esidents. See generally 42 U.S.C. S 11383(a); 24 C.F .R. S 583.100(a) (2000).

Recipients of Supportive Housing Program grants are selected through a nationwide competitive pr ocess. See 42 U.S.C. S 11386(b). As part of this process, LSS was required to submit to HUD a detailed application and pr oject proposal, which furnished information about: (1) the housing project itself, such as the project location, the number of homeless families that LSS would accommodate at that location, and the types of supportive services that would be offered at the site; (2) LSS's past experience in providing housing assistance, including pr evious housing programs it had operated and prior HUD grants it had received; and (3) the budget for the pr oposed project. In its application, LSS requested $1,326,965 in Supportive Housing Program funds to cover the cost of acquiring and rehabilitating the two apartment buildings, the operating expenses for those premises, the cost of the supportive services that would be offered at those sites, and a five percent administrative fee for the expenses LSS would incur in administering the Supportive Housing Program grant.

On February 5, 1996, LSS received final appr oval from HUD for a transitional housing project to be located at 49 Division Street in Greensburg, W estmoreland County. Several days later, LSS and HUD executed the Grant Agreement, which obligated HUD to provide $1,326,965 to the 49 Division Street project, and committed LSS to administer those funds at that project site. The Grant

6

Agreement, which was subject to renewal, carried a three-year term and was scheduled to expire in 1999. Shortly after the execution of the Grant Agreement, LSS purchased the Division Street property and began r enovations.

B.

Several months after entering into the Grant Agr eement with HUD, LSS began experiencing significant financial and administrative problems. LSS attempted to r esolve these difficulties by seeking consulting relationships with other non-profit entities. First, in September 1996, LSS entered into a consulting agreement with WHO, pursuant to which WHO was to furnish management assistance to LSS. However, this affiliation ended after a month when WHO elected to terminate the agreement upon discovering that LSS's financial troubles were mor e serious than originally anticipated. Subsequently, on November 9, 1996, LSS retained Adelphoi, Inc., another non-pr ofit organization operating in Westmoreland County. Pursuant to the management agreement entered into with Adelphoi, all of LSS's board members resigned and wer e replaced by new directors selected by Adelphoi.

Two months after Adelphoi took over LSS's management, LSS filed a voluntary Chapter 11 petition. At the time of the petition, LSS had drawn down approximately $288,800 in federal Supportive Housing Program moneys. LSS's interest in the grant relationship with HUD was not itself listed on the schedule of assets LSS submitted to the Bankruptcy Court. An Unsecured Creditors Committee was formed, and WHO, which had a claim against LSS for compensation based on the brief period it spent providing consulting services to LSS, accepted an invitation to sit on the Committee. WHO resigned from the Unsecur ed Creditors Committee in September 1997 due to accusations of a conflict of interest. However, WHO's assumption of LSS's Supportive Housing Program grant occurr ed prior to the date of this resignation.

Less than two weeks after LSS filed its Chapter 11 petition, HUD declared LSS in default of the Supportive Housing Program grant. By letter dated January 29, 1997,

7

HUD notified LSS that it could no longer r eceive Supportive Housing Program disbursements. HUD also infor med LSS that its grant would be reactivated should LSS develop a "workable plan" acceptable to HUD. Further more, HUD warned LSS that if a suitable plan was not forthcoming within 30 days, HUD would exercise its power to either cancel the remainder of the grant, or select a successor to administer the program. Although LSS did not r espond within the requested 30-day period, HUD did not in fact terminate the grant or replace LSS as grantee; rather, on March 4, 1997, HUD sent a follow-up communication to LSS, once again requesting a "work-out plan for the continued implementation of the [49 Division Str eet transitional housing] project."

Ultimately, LSS responded by proposing to HUD that Adelphoi acquire ownership of the Division Str eet property and that WHO take over administration of the transitional housing project located at that site. On May 28, 1997, WHO was substituted as recipient of LSS's Supportive Housing Program grant, and WHO and HUD executed the Grant Agreement Amendment, which identified WHO as the project sponsor and as the "Successor to Life Service Systems, Inc." The Amendment listed both 49 Division Street and a second site at 203 South Maple A venue as the relevant project locations for the transitional housing project. Apparently, WHO did not fur nish any consideration to LSS's estate in exchange for assuming the Grant Agreement, and neither WHO nor LSS provided notice of the assumption to the Unsecured Creditors Committee or to the Bankruptcy Court.

After assuming LSS's Supportive Housing Program grant, WHO did not in fact continue the transitional housing project at the Division Street location. Shortly after WHO and HUD executed the Grant Agreement Amendment, LSS, following its proposal that Adelphoi acquir e the transitional housing project's real property, petitioned the Bankruptcy Court to sell the Division Street property to Westmoreland CHODO, a non-profit entity controlled by Adelphoi (and apparently unaffiliated with WHO). With approval of the Bankruptcy Court, the Division Street r eal estate was put up for auction. However, Westmor eland CHODO was outbid

by a third party purchaser, and thus did not acquire the Division Street real estate. WHO, appar ently uninterested in dealing with the third party buyer, discontinued the transitional housing project at the Division Street site and elected to carry on the program at a dif ferent location.

C.

Following the property sale, the Bankruptcy Court appointed James Walsh as LSS's Chapter 11 Bankruptcy Trustee, at the request of the Unsecur ed Creditors Committee. On February 16, 1998, the Trustee instituted an adversary action against WHO in the Bankruptcy Court, alleging that WHO, as a member of the Unsecur ed Creditors Committee, owed a fiduciary duty to the other members of the Committee which it breached by taking over LSS's status as a recipient of federal Supportive Housing Program moneys without furnishing notice to other unsecured creditors or obtaining prior court appr oval.2 In its defense, WHO argued that it breached no fiduciary duty because LSS's interest in the Supportive Housing Pr ogram grant relationship with HUD was never property of LSS's bankruptcy estate within the meaning of S 541 of the Bankruptcy Code.

The Bankruptcy Court held in the Trustee's favor, concluding that LSS's interest in the grant r elationship with HUD constituted property of LSS's bankruptcy estate. Furthermore, the court determined that WHO did in fact breach its fiduciary duty to fellow Committee members, and awarded LSS's estate $135,653 in monetary r elief.3 WHO

(Text continued on page 11)

_____

2. LSS's Bankruptcy Trustee also instituted adversary actions against Adelphoi and LSS's board of directors (elected by Adelphoi), claiming, inter alia, a breach of fiduciary duty in connection with WHO's succession to the Supportive Housing Program grant. These actions were settled before trial.

3. As the remedy for WHO's alleged br each of fiduciary duty, LSS's Trustee did not seek to have the Bankruptcy Court void and set aside WHO's assumption of the Supportive Housing Pr ogram grant; rather, the Trustee only requested monetary damages. The record does not make the basis for this monetary relief entir ely clear. The following is our rendering.

9

The damage request consisted of three components. First, the Trustee sought compensation for claims brought by five individuals relocated by LSS as part of its acquisition and rehabilitation of the Division Street property. The Supportive Housing Program r equires a grant recipient to provide compensation to individuals displaced as a direct result of the recipient's supportive housing project. See 24 C.F.R. S 583.310 (2000). Although the record is silent on this issue, we can infer from the fact that these five individuals were listed among LSS's general unsecured creditors that LSS had failed to provide the full measure of assistance required by the Supportive Housing Pr ogram.

Second, LSS's Trustee sought recovery for amounts owed to matching fund grantors Westmoreland County Housing Authority, United Way, and Richard K. Mellon Foundation, also listed among LSS's general unsecured creditors. Before a grantee can receive federal funds under the Supportive Housing Program for the acquisition or rehabilitation of existing structures, or for new construction, it must obtain matching funds from non-HUD sources equal to the amount of federal funds it is requesting for those activities. See 42 U.S.C. S 11386(e); 24 C.F.R. S 583.145 (2000). To satisfy this obligation, LSS contributed its own moneys, and secured matching funds from the Westmoreland County Housing Authority, the United Way, and the Mellon Foundation. Although the record on appeal does not contain the terms of the agreements entered into by LSS and the matching fund grantors, the grantors apparently conditioned their pr ovision of matching funds on the continued use of those funds for a transitional housing project at the 49 Division Street location. According to the Bankruptcy Court, when WHO, after succeeding to LSS's interest in the Supportive Housing Program grant relationship with HUD, decided not to continue the project at the 49 Division Street site, the matching fund grantors acquired a claim against LSS's estate for a return of the balance of their donated moneys.

Finally, LSS's Trustee requested monetary relief in the amount of the Supportive Housing grant moneys allocated to the grantee's administrative expenses. According to the Bankruptcy Court, WHO benefitted by receiving this amount as part of its succession to LSS's Supportive Housing Program grant because WHO was able to use those moneys to pay part of its employee salaries without having to demonstrate that those employees worked exclusively on the administration of the transitional housing pr ogram.

The Bankruptcy Court's $135,653 award cover ed only the latter two components of the Trustee's monetary r elief claim. Because WHO stipulated at trial that it had assumed LSS's obligation to provide

10

appealed to the District Court for the Wester n District of Pennsylvania, contending that the Bankruptcy Court had erroneously concluded that LSS's interest in the Supportive Housing Program grant relationship with HUD qualified as property of LSS's bankruptcy estate. The District Court, however, affirmed the Bankruptcy Court's judgment, and WHO timely appealed to this court.4 In addition to the briefs of the parties, we requested (and r eceived) an amicus curiae brief from the Bankruptcy Section and the Commercial Litigation Department of the Civil Division of the Department of Justice stating their position on the central issues. We also gave the parties an opportunity to reply to this amicus brief.

## II. Property of the Estate

The filing of a voluntary petition in bankruptcy court commences a bankruptcy case and creates a bankruptcy estate comprised of the debtor's property as of the commencement of the case. See 11 U.S.C.SS 301, 541. Section 541(a)(1) of the Bankruptcy Code defines"property of the estate" as including "all legal or equitable interests of the debtor in property as of the commencement of the case." Id. S 541(a)(1). As the Supr eme Court observed in United States v. Whiting Pools, Inc., 462 U.S. 198 (1983), S 541(a)'s legislative history demonstrates that the language of this provision was intended to sweep br oadly to include "all kinds of property, including tangible or intangible property, causes of action . . . and all other forms of property currently specified in section 70a of the Bankruptcy Act." Id. at 205 n.9 (quoting H.R. Rep. No. 95–595, at 367 (1977), reprinted in 1978 U.S.C.C.A.N. 5963); see also In re O'Dowd, 233 F.3d 197, 202 (3d Cir. 2000).

In view of this definition, we must determine whether LSS's interest in the grant relationship constituted a "legal

_____

relocation assistance to the five displaced individuals (the first component), the Bankruptcy Court held that LSS's bankruptcy estate could not recover that amount.

4. The Bankruptcy Court exercised jurisdiction pursuant to 28 U.S.C. S 157, the District Court had jurisdiction under 28 U.S.C. S 158(a)(1), and we have jurisdiction pursuant to 28 U.S.C. S 158(d).

or equitable interest[ ]" that, under the terms of S 541(a)(1), falls within S 541's property definition. Because a district court's conclusion as to whether an item constitutes "property of the estate" for purposes of S 541 raises a question of law, our review is plenary. See In re Blatstein, 192 F.3d 88, 94 (3d Cir. 1999). W e first identify the specific interests regarded by the District Court as constituting property of LSS's bankruptcy estate. We next examine the ways in which a federal agency's supervisory inter est in a grant relationship can alter the dynamics of S 541's property calculus. We then focus on the District Court's principal error in this case, i.e., its failur e entirely to account for HUD's weighty federal interest in the Supportive Housing Program, and conclude that, had the court given proper weight to HUD's strong interest, LSS's interest in the grant relationship would have been excluded from LSS's estate for bankruptcy purposes. Finally, we note that considerations of bankruptcy policy militate in favor of excluding LSS's interest from S 541's property definition. In the course of this discussion, we distinguish LSS's Trustee's attempts to rely on case law holding that government-issued licenses, in general, qualify as property of the estate under the Bankruptcy Code. Our last task will then be to delineate the scope of our holding in the instant case.

A.

Analysis under S 541's property definition must begin by focusing directly on the specific inter ests claimed to constitute the debtor's property. In the case before us, the District Court characterized LSS's interest in the grant relationship as a set of contractual rights arising out of the Grant Agreement executed between LSS and HUD in 1995, ultimately deciding that these contractual rights were property of LSS's bankruptcy estate. In r eaching this conclusion, the District Court began by turning to relevant Pennsylvania state law and determining that, under that case law, contractual rights are classified as property interests. See, e.g., Klingner v. Pocono Int'l Raceway, Inc., 433 A.2d 1357, 1361 (Pa. Super. Ct. 1981) (noting that contractual rights are personal property under Pennsylvania law).

12

In terms of our analysis, we do not question the District Court's reading of Pennsylvania law, and assume that ordinary contract rights would qualify as such property interests under that state law; it is well-established that federal courts typically must look to state law in ascertaining the existence and scope of the debtor's "legal or equitable interests" for purposes of S 541(a)(1). See Butner v. United States, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of pr operty rights in the assets of a bankrupt's estate to state law.") (footnote omitted); O'Dowd, 233 F.3d at 202 ("While federal law defines what types of property comprise the estate, state law generally determines what interest, if any, a debtor has in property."). It is also settled that the expansive nature of S 541's property definition encompasses rights and interests arising from ordinary contractual r elationships. See 5 Collier on Bankruptcy P 541.08[4], at 541-49 (15th ed. rev., King et al. eds., 1996); see also In re Minoco Group of Cos., Ltd., 799 F.2d 517, 519 (9th Cir. 1986) (holding that insurance contracts constitute "property of the estate" for purposes of S 541).

Attempting to delineate the scope of LSS's inter est in the grant relationship, the District Court examined the provisions of the Grant Agreement executed in 1995 between LSS and HUD, and identified three sets of contractual rights that it believed arose out of the relationship: (1) the debtor LSS's right to r eceive payment from HUD for authorized expenditures that LSS incurred while administering its Supportive Housing Pr ogram project; (2) the debtor's right to compel HUD to make payments in connection with LSS's administration of the Supportive Housing Program; and (3) the debtor's right to assign its interest in the Supportive Housing Grant, subject to HUD's prior written approval. The court then held that LSS's interest in the grant relationship, evidenced by these three sets of rights, qualified as pr operty of LSS's bankruptcy estate within the meaning of S 541. We conclude that this decision was incorrect.

B.

At bottom, the problem with the District Court's S 541 property analysis lies in its failure to take into account

13

HUD's strong federal interest in supervising the efficient and effective administration of Supportive Housing Program grant funds by intermediaries such as LSS, designed to ensure that the Program's ultimate beneficiaries (i.e., homeless individuals) receive the full measur e of federal assistance afforded to them under the ter ms of the Program. As will be seen in detail below, HUD's singular interest in preserving such a supervisory role--evidenced by the strict and pervasive oversight imposed by the Supportive Housing Program scheme on the grant relationship--can alter the dynamics of S 541's property calculus, resulting in the exclusion of the grantee's interest from its bankruptcy estate.

Our analysis proceeds in several steps. W e first explain that a federal agency's supervisory interest over the administration of a grant program can r esult in the exclusion of a grantee's interest in the grant relationship from S 541's property definition if the interest is sufficiently weighty. We then present a method for assessing when an agency's interest rises to such a level. Finally, we focus on the facts of the case before us and on the specific provisions of the Supportive Housing Pr ogram, explaining the two related ways in which the District Court's failure to account for HUD's supervisory interest manifested itself: (1) the court neglected to consider the pervasive r estrictions imposed on a Program grantee's rights by the substantive provisions of two major components of the Supportive Housing Program grant scheme; and (2) in light of these limitations, the court construed the scope of the LSS's rights under the grant arrangement too expansively.

1.

A federal agency like HUD clearly has a substantial supervisory interest in preserving the coherence and integrity of the federal grant scheme it is char ged with administering, and in ensuring that federal grant moneys disbursed pursuant to that scheme are dispensed by intermediaries in an efficient and ef fective manner to the ultimate beneficiaries of the grant. While the Bankruptcy Code's property definition is certainly expansive, it is not limitless, and, as we will demonstrate, a federal agency's

14

strong supervisory interest in the administration of a grant program can play a significant role in determining whether the interests created by a federal grant program fall within S 541's definition of "property of the estate."

We recognize, of course, that each time a federal agency executes a contractual agreement with a private party, or enters into an arrangement with an entity in or der to furnish assistance to the public, a federal interest is arguably implicated. We therefor e must take care to distinguish those situations in which a federal grantor agency's supervisory interest is sufficiently weighty to exclude the grantee's interest in the grant r elationship from S 541's property definition from those situations in which it is not. As we see it, the strength of an agency's supervisory interest can best be gauged by examining the substantive provisions of the grant scheme established by applicable federal statutes and regulations. Cf. In r e Joliet–Will County Cmty. Action Agency, 847 F.2d 430, 431–32 (7th Cir. 1988) (analyzing the provisions of a federal "foster grandparents" grant program administered by ACTION as part of the S 541 bankruptcy property inquiry).

To be sure, if a provision of a federal grant program specifically authorizes federal grant moneys to be used to pay a debtor grantee's creditors, it will be difficult for us to conclude that the federal agency's interest is sufficiently weighty to exclude the debtor's interest fr om S 541's property definition. Cf. id. at 432. But the Supportive Housing Program involved in the case befor e us contains no such authorization, and thus our analysis of the nature of HUD's supervisory interest, as manifested in the substantive provisions of the Program, must be more searching.

The strength of an agency's supervisory inter est can best be measured by the level of agency oversight over the grant relationship preserved in the provisions of the federal grant program. A grant framework clearly evidences a desire to sustain the federal agency's strong supervisory interest over that relationship when it: (1) gives an agency extensive control over the identity of the grant r ecipients with whom it must deal by limiting the pool of applicants eligible to receive funds, and by restricting the grantee's ability to

15

substitute a replacement entity in its stead; and (2) imposes rigorous federal oversight of the grantee's per formance in furtherance of the grant relationship.

As we see it, a federal agency's retention of pervasive restrictions on a grantee's identity and manner of performance under a HUD-type grant pr ogram is inconsistent with the grantee's assertion of a pr operty interest in the grant relationship. As we will discuss below after examining the details of the Supportive Housing Program, such limitations greatly constrict the scope of the rights yielded to the grantee by the terms of the grant arrangement, and substantially (if not completely) r estrict their transferability and alienability, ther eby effectively rendering the grantee's interest essentially valueless. Moreover, as we explain infra in Part II.C., inclusion of such interests in the grantee's bankruptcy estate would further neither the equitable nor the rehabilitative purpose of the Bankruptcy Code. As a result, we are satisfied that if these controls are sufficiently extensive, i.e., if, under the terms of the arrangement between the grantor federal agency and the grantee, the agency retains strict, pervasive, and minute oversight over the identity of the grant r ecipient and the manner of that recipient's perfor mance, the existence of such controls can demonstrate that the federal grantor agency's interest in ensuring the effective administration of that program is weighty enough to exclude the grantee's interest from S 541's property definition.5

A number of federal courts have applied a similar approach to resolve the related question whether

_____

5. Our analysis of the supervisory controls and limitations over the grant arrangement reserved to HUD is not meant to speak to the relationship between federal grantees and grantor agencies in other contexts, such as the government's liability for the acts of its grantees for purposes of the
Federal Tort Claims Act. In that context, the Supreme Court has distinguished between the pervasive conditions imposed by a grantor agency to further federal supervision of the grant's administration, and the control over day-to-day operations r etained by the grant recipient. Because of this distinction, the Court has held that federal "regulations do not convert the acts of entrepreneurs .. . into federal government acts." United States v. Orleans, 425 U.S. 807, 816 (1976) (footnote omitted).

16

unexpended federal funds themselves and property purchased with those moneys once disbursed (as opposed to contract rights like those at issue on this appeal) constitute bankruptcy property of the debtor within the meaning of S 541. For instance, the Seventh Circuit in Joliet-Will considered the bankruptcy property status of such funds and property in the case of a bankrupt nonprofit community service organization. Although the debtor's trustee claimed that those items repr esented property of the debtor's estate, the Seventh Circuit concluded that the federal moneys and personal pr operty fell outside of S 541's property definition because the nature of the federal grant program and the relationship between the grantee community organization and grantor federal agency rendered the debtor organization "a trustee, custodian, or other intermediary, who lacks beneficial title and is merely an agent for the disbursal of funds belonging to another." Id. at 432 (citing to 11 U.S.C. S 541(d)).

In reaching this conclusion, the court r elied principally on the fact that "[t]he grants impose minute controls on the use of the funds, such that the recipient has very little discretion." Id. (emphasis added). More specifically, the court noted that each grant required the r ecipient to adhere to a budget identifying particular project items and the costs chargeable to the grant for each item; that the grantee could not re-allocate unused moneys between items; that the grantee was required to reconvey title to property purchased with grant funds and costing mor e than $1,000 to the federal government, at the federal agency's direction; and that the statutes and regulations cr eating the grant scheme did not authorize the grantor federal agency to permit grant moneys to be used to pay cr editors of the private grantee. See id.

Federal district and bankruptcy courts have also used the pervasiveness of government control over the administration of a grant program as the touchstone for assessing whether federal grant moneys and the pr operty purchased with those moneys constitute pr operty of the grantee's bankruptcy estate. See, e.g., In r e Community Assocs., Inc., 173 B.R. 824, 828 (D. Conn. 1994) (holding that three vans purchased with grant funds by the debtor,

17

a private community service organization, did not constitute property of the debtor's estate for bankruptcy purposes, on the ground that the agreement between the grantee organization and grantor agency imposed " `minute controls' on . . . [the] use of the grant funds and the use of the vans" purchased with those grant funds); In r e Alpha Ctr., Inc., 165 B.R. 881, 884 (Bankr. S.D. Ill. 1994) (holding that a van and state grant moneys transferred by the debtor community service organization to a successor grantee were not property of the debtor's estate for bankruptcy purposes, on the ground that extensive legislation and r egulatory rules restricted the debtor community service organization's discretion as to the use of grant moneys and vans purchased with those grant moneys); cf. In re Southwest Citizens' Org. for Poverty Elimination, 91 B.R. 278, 286–87 (Bankr. D.N.J. 1988) (noting that, although the federal grantor agency conceded that twenty vehicles pur chased by the debtor community service organization with federal grant funds constituted property of the debtor's estate, the federal agency, by virtue of the restrictions imposed by the agency on the grantee's use of the funds, retained an "equitable reversionary interest" in the vehicles superior to the debtor's interest and the debtor's trustee's interest as a hypothetical lien creditor under 11 U.S.C.S 544). We believe that such a "minute control" analysis is equally appropriate in assessing whether a debtor's interest in a grant relationship with HUD qualifies as pr operty of the debtor's estate under the terms of the Bankruptcy Code.

We hold then that a federal agency's inter est in ensuring the efficient administration of program funds can result in the exclusion of the debtor grantee's interest in the grant relationship from S 541's pr operty definition if the agency's supervisory controls over the identity of the grantee and the manner of the grantee's performance ar e sufficiently pervasive and rigorous. The District Court, however, neglected entirely to take account of HUD's str ong interest in the Supportive Housing Program. This omission manifested itself in two related ways. First, the court mistakenly viewed the provisions of the Grant Agreement itself as the exclusive calipers for measuring the rights and obligations that LSS and HUD incurred by virtue of their grantor/grantee relationship, failing to consider the

18

restrictions placed on those rights by the other major components of the Supportive Housing Program, both statutory and regulatory. Second, the court construed the scope of the contractual rights it identified as arising out of the Grant Agreement too expansively, omitting consideration of the limitations imposed on those rights by the full Supportive Housing Program scheme. W e now turn to the facts of the case sub judice and to the details of the Supportive Housing Program, and explain why the District Court's conclusion that LSS's interest in the Program qualified as bankruptcy property was err oneous.

2.

The District Court conducted its "property of the estate" inquiry by focusing solely on the Grant Agreement executed between LSS and HUD in 1995, concluding that "LSS' rights under the Grant Agreement became property of the bankruptcy estate once the bankruptcy petition wasfiled." By confining its examination to the Grant Agr eement, however, the court failed to take into account the fact that the Grant Agreement represents only one component of a broader federal grant scheme. To be sur e, the grant agreement into which the government and a grantee enter is an important element of the Supportive Housing Program's framework for the disbursement and administration of federal housing assistance funds. See 24 C.F.R. S 583.400(a) (2000) ("The duty to provide supportive housing or supportive services in accordance with the requirements of this part will be incorporated in a grant agreement executed by HUD and the recipient."). However, the grant agreement is by no means the exclusive source of those parties' rights and obligations under the federal Supportive Housing Program. The rights and obligations of grantor and grantee are also detailed in: (1) Subtitle C of the Stewart B. McKinney Homeless Assistance Act (Homeless Assistance Act or Act), 42 U.S.C. SS 11381-89; and (2) a set of regulations codified at 24 C.F.R. S 583 (Supportive Housing Rule or Rule), see 42 U.S.C. S 11387 (authorizing the HUD Secretary to issue final regulations implementing the Homeless Assistance Act). In fact, the Grant Agreement itself recognizes that the provisions of the

19

Homeless Assistance Act and the Supportive Housing Rule
are integral elements of the grant relationship. For example,
the Grant Agreement states that "[t]his grant agreement will
be governed by the [Homeless Assistance] Act, [and] the
Supportive Housing rule (24 CFR 583), a copy of which is
attached hereto . . . and made a part her eof."

Considering all of the components of the Supportive
Housing Program as a coherent whole, it is evident that
HUD's strong federal interest in safeguar ding the effective
administration of Program funds, demonstrated by the
rigorous controls imposed on the grant r elationship by the
Act and the Rule, suffices to exclude LSS's inter est in the
grant relationship from LSS's bankruptcy estate. The
Supportive Housing Program scheme--embodied in the
Homeless Assistance Act, Supportive Housing Rule, and the
grant agreement executed between HUD and the grantee--
places important limitations on and provides HUD with
extensive oversight over both the identity of grant recipients
and the manner of those recipients' per formances under
the grant arrangement. Turning first to the restrictions
imposed on the identity of grantees, the provisions of the
Program limit eligibility for receipt of federal funding to
certain statutorily-enumerated entities: only "a State,
metropolitan city, urban county, governmental entity,
private nonprofit organization, or community mental health
association that is a public nonprofit or ganization" is
eligible to serve as a grant recipient. See 42 U.S.C.
S 11382(1).d

Further, in order to secure the right to administer
Program funds, even those entities within this limited pool
of eligible applicants must participate in a nationwide
competitive process, in which they are r equired to submit a
comprehensive project proposal. Recipients are selected by
HUD, and the Homeless Assistance Act expressly mandates
that HUD use the seven statutorily-enumerated criteria
listed in the margin in order to make its selection. See 42
U.S.C. S 11386(b).6 On their face, these seven criteria

_____

6. Section 11386(b), titled "Selection criteria," states in full:

    The Secretary [of Housing and Urban Development] shall select
    applicants approved by the Secretary as tofinancial responsibility
to

demonstrate that HUD is to use these factors as a screen
for ensuring that the grant recipient will implement its
proposed project and administer Supportive Housing
Program funds in an efficient and effective manner.

In addition, and most importantly, the Supportive
Housing Program preserves HUD's contr ol over the identity
of the grant recipient by prohibiting changes in the grantee
absent HUD's prior written approval. The Supportive
Housing Rule states that "[a] recipient may not make any
significant changes to an approved pr ogram without prior
HUD approval," and expressly defines"significant changes"
to include "a change in the recipient." 24 C.F.R.
S 583.405(a)(1) (2000). This general r estraint on a grantee's
ability to alienate or assign its interest in the grant
arrangement with HUD is also reflected in a provision of the
Grant Agreement executed between LSS and HUD:"No
change may be made to the project nor any right, benefit,
or advantage of the Recipient hereunder be assigned
without prior written approval of HUD."
_____

receive assistance under this part by a national competition based
on criteria established by the Secretary, which shall include--

(1) the ability of the applicant to develop an d operate a
project;

(2) the innovative quality of the proposa l in providing a
project;

(3) the need for the type of project pr oposed by the applicant in
the area to be served;

(4) the extent to which the amount of assistan ce to be provided
under this part will be supplemented with resources from other
public and private sources;

(5) the cost-effectiveness of the pr oposed project;

(6) the extent to which the applicant has demo nstrated
coordination with other Federal, State, local, private and other
entities serving homeless persons in the planning and operation of
the project, to the extent practicable; and

(7) such other factors as the Secretary d etermines to be
appropriate to carry out this part in an ef fective and efficient
manner.

42 U.S.C. S 11386(b).

The Supportive Housing Program's limitations on the uses to which grantees can put federal funds are just as strict, if not more so, than the Program's controls over the identity of grant recipients. In general, a Supportive Housing Program grant is tied to a particular project location, detailed in the recipient's funding proposal and application. A recipient may not change the location of the project site without prior written HUD approval. See 24 C.F.R. S 583.405(a)(1) (2000). Furthermore, the Supportive Housing Rule requires each recipient's project to comply with all applicable state and local housing codes, see id. S 583.300(a), and to meet various habitability standards with respect to such matters as structure and materials, interior air quality, and water supply, see id. S 583.300(b). Most importantly, if the grant recipient receives Supportive Housing Program moneys for acquisition, rehabilitation, or new construction purposes, the Supportive Housing Program requires that the recipient continue to use the property at that project site for the particular purposes specified in the funding application for at least 20 years. See 42 U.S.C. S 11383(b)(1); 24 C.F.R. S 583.305(a) (2000).

Finally, the Supportive Housing Program furnishes HUD with a series of remedial options exercisable in the event of a default on the part of the grant recipient. For example, should the grantee cease to use the project site for the agreed-upon project purposes before the expiration of the 20-year period, the Supportive Housing Program mandates that the recipient be required to repay to HUD some or all of the federal grant moneys it has received. If the property ceases to be used for listed project purposes within 10 years of the project's start date, the Program requires that the recipient repay to HUD 100 per cent of the acquisition, rehabilitation, or new construction assistance received. And if the property ceases being used in the required manner some time after 10 years have passed, the repayment obligation is reduced by 10 percentage points for each year in excess of the 10 years that the property was used as supportive housing. See 42 U.S.C. S 11383(c)(1); 24 C.F.R. S 583.305(b) (2000). In addition, the Grant Agreement executed between LSS and HUD lists other remedial options available to HUD upon due notice to the grantee, including the issuance of a letter of warning requesting

22

corrective action, the reduction of grant amounts, and the substitution of an alternate recipient of HUD's choosing.

In the aggregate, these provisions demonstrate that the Supportive Housing Program contemplates a str ong supervisory role for HUD, the agency char ged with implementing the Program and ensuring its efficient and effective administration. As we see it, HUD's interest was strong enough to materially affect theS 541 "property of the estate" calculus, excluding LSS's interest in the grant relationship with HUD from LSS's bankruptcy estate. In contrast, in its opinion, the District Court never mentioned either the Homeless Assistance Act or the Supportive Housing Rule, instead focusing exclusively on the Grant Agreement. The court's failure to account for HUD's strong supervisory interest in the administration of the Supportive Housing Program led to its incorrect conclusion that LSS's interest qualified as property of its bankruptcy estate.

Furthermore, by omitting consideration of HUD's strong supervisory interest in the grant relationship, the District Court also appeared to give too much weight to LSS's contractual rights, because it failed to consider the limitations imposed on those rights by the substantive provisions of the Supportive Housing Pr ogram scheme. For example, in identifying the contractual rights yielded to LSS by virtue of its grant relationship with HUD, the District Court pointed to the fact that LSS had the power to assign its interest in the Supportive Housing Grant arrangement to another party. Although it recognized that this power of assignment was subject to HUD's prior written appr oval, the District Court did not take sufficient note of the extent of the restrictions that the other components of the Supportive Housing Program, i.e., the Homeless Assistance Act and the Supportive Housing Rule, placed on the grantee's power to assign.

For instance, as discussed above, S 11382(1) of the Homeless Assistance Act restricts eligibility for Supportive Housing Program funding to a prescribed list of entities-- essentially state and local government units and non-profit organizations--and S 11386(b) of the Act directs that grantees be selected by HUD according to expr ess statutorily-enumerated criteria. Under the ter ms of the

23

Supportive Housing Program, LSS would not have had the power to assign its interest to a party that fell outside of S 11382(1)'s list of eligible entities--e.g., a private for-profit corporation--or to a party that failed to meet the criteria set forth in S 11386(b). The District Court's analysis, however, implied that LSS's right to assign was limited solely by the necessity of HUD's formal approval, and not by the substantial restrictions on the grant r elationship imposed by the other components of the Supportive Housing Program. In short, by omitting consideration of HUD's strong supervisory interest, the court construed the scope of the grantee's power of assignment too broadly.7

_____

7. Although not necessary to our conclusion that LSS's interest in the grant relationship fails to constitute part of the property of its bankruptcy estate, we note another way in which the District Court's assessment of the scope of LSS's interest was too expansive. As noted at the outset of Section II, the District Court, in concluding that LSS had a cognizable property interest for bankruptcy purposes, also pointed to two other contractual rights that it believed LSS possessed as a consequence of its grant relationship with HUD: (1) LSS's right to receive payment from HUD for authorized expenditur es incurred while administering its Supportive Housing Program pr oject; and (2) LSS's right to compel HUD to make payments in connection with LSS's administration of the Supportive Housing Program. In essence, these rights represent two sides of the same coin: both are concerned with LSS's ability to require HUD to pay moneys for expenses that LSS incurred in implementing and running its Supportive Housing Program project, and hence our discussion treats these two rights together.

The Department of Justice (DOJ), as amicus curiae, argues that, just as the District Court construed LSS's power of assignment too robustly, so too it treated these contractual rights to compel payment as having too broad a scope. Specifically, DOJ contends that LSS did not have a general right to receive moneys for HUD. Rather , DOJ asserts, LSS's right to receive payment from HUD was cir cumscribed by the provisions of the Tucker Act, which authorizes actions seeking money damages against the federal government for breach of contract. See 28 U.S.C. S 1346(a)(2) ("Little Tucker Act" granting concurrent jurisdiction to the district courts and the United States Court of Federal Claims over claims, not in excess of $10,000, founded "upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort"); id.  S 1491(a)(1) ("Big Tucker Act"
granting exclusive jurisdiction to the United States Court of Federal Claims over identical claims in excess of $10,000); Dia Navigation Co. v. Pomeroy, 34 F.3d 1255, 1267 (3d Cir. 1994).

24

C.

Considerations of bankruptcy policy also militate in favor
of the conclusion detailed in the previous section. Cf.
_____

According to DOJ, a claim against the federal government under the
Tucker Act will lie only if the government, in administering the grant
program, incurs a contractual obligation to the grantee, breaches that
obligation (thereby injuring the grantee), and the grantee then uses the
Tucker Act as a vehicle for obtaining "monetary compensation for [this]
past injury." Cole County Reg'l Sewer Dist. v. United States, 22 Cl. Ct.
551, 556 (1991), aff 'd without opinion, 949 F.2d 402, 404 (Fed. Cir.
1991); see also City of Wheeling v. United States, 20 Cl. Ct. 659, 664
(1990) (holding that the Claims Court, the pr edecessor to the Court of
Federal Claims, has jurisdiction under the Tucker Act to hear a city's
challenge to the Environmental Protection Agency's refusal to disburse
grant funds to cover the increased engineering fee the city was obligated
to pay as a result of its renegotiation of an engineering contract, on the
ground that the city's claim "seeks a r emedy which is retroactive in
nature (monetary compensation for an injury to property)").

With respect to the Supportive Housing Program, DOJ contends that
a contractual obligation on the part of HUD would have been triggered
only if LSS had expended its own moneys for authorized Program
expenses, and then HUD had refused to r eimburse LSS out of the grant
funds allocated to LSS's supportive housing pr oject. Thus, according to
DOJ, LSS did not have the broad, generalized right to compel HUD to
disburse Program moneys that the District Court appeared to assume
that LSS possessed; rather, the argument continues, LSS had the much
narrower right to receive grant funds fr om HUD to cover expenses
incurred in furtherance of authorized grant purposes.

DOJ's analysis of LSS's ability to compel payment of Program moneys
glosses over significant unresolved issues, e.g., whether federal
assistance agreements, such as the Grant Agr eement at issue on this
appeal, constitute "express or implied contract[s]" within the meaning of
the Tucker Act. The jurisprudence on this issue is inconclusive. Compare
Trauma Serv. Group, Ltd. v. United States, 33 Fed. Cl. 426, 429–30
(1995) (holding that a cooperative agreement, a species of federal
assistance agreement identified in the Federal Grant and Cooperative
Agreement Act, did not qualify as a contract within the coverage of the
Tucker Act), aff 'd on other grounds, 104 F.3d 1321 (Fed. Cir. 1997) with
Thermalon Indus., Ltd. v. United States, 34 Fed. Cl. 411, 413, 414 (1995)
(holding that a grant agreement "satisfies the criteria for an express or
implied contract with the United States and, thus, falls within the scope

25

Kokoszka v. Belford, 417 U.S. 642, 645 (1974) (noting that because "it is impossible to give any categorical definition to the word `property' " as used inS 70a(5) of the Bankruptcy Act, the predecessor to the current definition of property contained in 11 U.S.C. S 541, "[i]n determining the term's scope--and its limitations--the purposes of the Bankruptcy Act must ultimately govern") (inter nal quotation marks and citations omitted). It is well-settled that two overarching purposes, one equitable and the other rehabilitative, undergird the Bankruptcy Code in general and the definition of property contained in S 541 in particular. See, e.g., In re Andrews, 80 F.3d 906, 909 (4th Cir. 1996). First, the Bankruptcy Code attempts to provide for the efficient and equitable distribution of an insolvent debtor's remaining assets to its creditors. See, e.g., City of New York v. Quanta Resources Corp., 739 F.2d 912, 915 (3d Cir. 1984). Second, the Code seeks to provide debtors with a

_____

of . . . Tucker Act jurisdiction" so long as it meets the general black letter
requirements for a binding contract, i.e.,"a mutual intent to contract including an offer, an acceptance, and consideration passing between the parties"). See also Jeffrey C. Walker, Note, Enforcing Grants and Cooperative Agreements as Contracts Under the Tucker Act, 26 Pub. Cont. L.J. 683 (1997) (analyzing the disagreement between the Court of Federal Claim's decisions in Trauma Services and Thermalon, and reasoning that federal assistance agreements should constitute "contracts" for purposes of the Tucker Act).

The case before us does not directly pr esent a claim by LSS seeking to compel HUD to pay over Supportive Housing Pr ogram funds, however, and we will therefore refrain fr om resolving such open issues. Nonetheless, we believe that DOJ's argument in regard to the scope of LSS's right to compel payment is not without for ce. If grant agreements do qualify as contracts for Tucker Act purposes, it appears that the District Court overemphasized the scope of LSS's right to receive Program moneys from HUD insofar as the court characterized it as a general right to compel payment from HUD. T o the contrary, under the Tucker Act regime advanced by the gover nment, LSS's right is much narrower, in that a claim against the federal government for money owed would lie only if LSS incurred expenses authorized by the terms of the Supportive Housing Program, and HUD refused to disburse federal moneys to cover such expenses. While the for egoing analysis does not inform our decision, it does inveigh against facile, expansive construction of LSS's rights under the Grant Agr eement.

26

"fresh start" by relieving them of the weight of their outstanding debts and permitting them to r eorganize their affairs. See, e.g., United States v. Whiting Pools, Inc., 462 U.S. 198, 203 (1983); Insurance Co. of North America v. Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995). We do not believe that inclusion of intangible contractual rightsflowing from a HUD-type federal grant arrangement will further either of the dual purposes of the Bankruptcy Code.

Under the scheme contemplated by the Bankruptcy Code, a debtor's creditors are typically compensated to the extent possible and in as equitable a fashion as possible pursuant to a court-approved plan, generally after the trustee marshals the debtor's bankruptcy property and liquidates it at a bankruptcy sale. As a practical matter, in order for such a procedure to generate a pool of funds from which creditors can be compensated, the items constituting the bankrupt's property must be readily alienable and assignable--i.e., they must be capable of being sold to a third party and of fetching some value as a consequence of that sale. Unlike a federal license, which fur nishes clear, quantifiable benefits to the licensee, it is difficult to see how LSS's tenuous interest in the Supportive Housing Program grant relationship with HUD would yield that value, given the fact that, as discussed supra in Part II.B.2, any potential purchaser would surely have to fall within the list of eligible applicants contained in S 11382(1) of the Homeless Assistance Act, and would be requir ed to meet the criteria set forth in S 11386(b). Mor eover, it is unclear why an entity that qualifies as an eligible applicant under S 11382(1) would elect to bid on and pur chase the opportunity to administer Program funds fr om a previous grantee, rather than simply engaging in the or dinary grantee selection process. Put another way, even were LSS's Trustee to place the right to succeed to LSS's interest in the Grant Agreement with HUD up for auction, we ar e dubious, as a practical matter, that any potential buyers would actually bid for that right.

Inclusion of a grantee's intangible contractual rights as part of the bankruptcy estate in furtherance of the Bankruptcy Code's rehabilitative goal seems equally problematic. It is true that a debtor's "r eorganization effort

27

would have small chance of success . . . if pr operty essential to running the business were excluded from the estate," Whiting Pools, 462 U.S. at 203; cf. Stewart v. Gurley, 745 F.2d 1194, 1196 (9th Cir . 1984) (per curiam) ("Unless the debtor can demonstrate that the pr operty is necessary to an effective reorganization, the property is of no value to him.").8 However , given the pervasive supervisory controls over the grant reserved to HUD under the terms of the Supportive Housing Pr ogram scheme, see supra Part II.B.2., it is difficult to see how LSS's interest in the Supportive Housing Program grant could be considered essential to the continued operation of its community service operations.

The Supportive Housing Program makes available to HUD an array of remedial options in the event of a default on the part of a grantee, such as the filing of a bankruptcy petition. For instance, under the terms of the Grant Agreement executed between LSS and HUD, once the grantee defaults, HUD can seek to preserve the integrity of the Supportive Housing Program grant by or dering the recipient to stop incurring costs chargeable to the grant program, by reducing the amount of grant moneys available, or by substituting another recipient of HUD's choosing. In fact, after LSS filed its Chapter 11 bankruptcy petition on January 14, 1997, HUD exercised one such remedial option by freezing LSS's ability to draw down grant moneys. Neither of the parties disputes that HUD's actions were authorized by the Supportive Housing Program. In light of this freeze on the disbursement of funds to LSS, it is difficult to see how LSS's contractual interest in the grant relationship would be of any assistance to its business reorganization.

In short, we think, as a practical matter, that LSS's tenuous interest in the Supportive Housing grant

_____

8. In fact, if an item of property in the hands of a third party is essential
to the debtor's continuing business operations, the debtor's trustee, provided that the appropriate statutory conditions are met, will typically seek to have the property turned over the debtor's estate, see 11 U.S.C. SS 542-43, or to have the transfer set aside, see id. S 544. Interestingly,
in the instant case, LSS's Trustee never sought to have WHO's assumption of the Supportive Housing Grant voided.

arrangement, subject to HUD's pervasive supervisory controls, would yield no value even if put up for auction by LSS's Trustee. Given the apparent worthlessness of LSS's interest, we do not believe that inclusion of that interest within S 541's definition of property would serve either the Bankruptcy Code's equitable goal of protecting creditors by ensuring that they are fairly compensated fr om a tangible pool of funds, or the Code's rehabilitative goal of permitting the debtor to make a fresh start.

D.

In response to this S 541 property analysis, LSS's Trustee counters that even highly regulated items of pr operty, such as stock exchange seats and government-issued licenses, can constitute "property of the estate" for bankruptcy purposes, and argues, therefore, that the fact that federal law imposes significant restrictions on grantees such as LSS should not preclude the grantee's inter est from falling within the Bankruptcy Code's property definition. In support of this position, the Trustee points us to such decisions as In re Page, 107 F . 89 (3d Cir. 1901), involving the bankruptcy status of a member's seat on the Philadelphia Stock Exchange, see id. at 89, and In re Central Arkansas Broadcasting Company, 68 F.3d 213 (8th Cir. 1995) (per curiam), concerning the bankruptcy status of a radio station broadcasting license issued by the Federal Communications Commission (FCC), see id. at 214. The Trustee is certainly correct in contending that the fact of significant regulatory control, by itself, will not keep a piece of property outside of S 541's expansive scope, and we do not mean to suggest that regulation qua regulation directs the outcome of the S 541 property inquiry. Rather, we conclude only that, under the appropriate set of circumstances, the supervisory controls imposed on a grant relationship by the substantive provisions of the grant program can be sufficiently pervasive, strict, and minute so as to make manifest the federal agency's str ong interest in overseeing the administration of that grant pr ogram. It is that weighty federal interest, and not the bar e fact of regulation itself, that can keep the debtor's interest in the grant relationship outside of S 541's pr operty definition.

29

Furthermore, the Trustee's r eliance on cases such as Page and Central Arkansas Broadcasting is unavailing. In Page, a decision that is now a century old, we held that a debtor's seat on the Philadelphia Stock Exchange qualified as property of the bankruptcy estate under the Bankruptcy Act of 1898, notwithstanding the fact that the Stock Exchange's constitution required any sale or transfer of the seat to be approved by the Exchange. See Page, 107 F. at 92. We noted that this limitation "possibly affected the value of the seat for the purposes of sale, but, while restricting, did not destroy its transferability." Id. However, our decision in Page has little bearing on our analysis in the instant case. Unlike Page, which examined the effect of a transfer restriction alone on the bankruptcy status of the subject property, our S 541 property analysis takes into account the full panoply of supervisory conditions and controls imposed by the Supportive Housing Pr ogram scheme on the grant relationship between LSS and HUD. More importantly, because the case befor e us involves a federal agency with a substantial interest in overseeing the grant program it is charged with administering, we must accord greater weight to that gover nmental interest than we ordinarily would provide, as in Page , to a private entity's supervisory interest over its relationship with its constituent members.

The Trustee's reliance on Central Arkansas Broadcasting, in which the Court of Appeals for the Eighth Cir cuit held that a FCC-issued radio operating license fell within the ambit of the Bankruptcy Code's property definition, see 68 F.3d at 214-15, does more to advance his case. After all, the fact that the FCC, a federal agency, designates a particular radio operator as licensee and retains the power to approve the transfer of an issued license does implicate a federal concern. Moreover, the Eighth Circuit's decision is consistent with a line of cases holding that state-issued licenses, commonly liquor licenses, are encompassed within S 541's property definition. See, e.g., In re Nejberger, 934 F.2d 1300, 1300-01 (3d Cir. 1991) (holding that a debtor licensee's interest in a license issued by the Pennsylvania Liquor Control Board constituted pr operty of the debtor's estate within the meaning of S 541). Nonetheless, we conclude that there are fundamental dif ferences in the

30

nature of a HUD-type grant relationship as compared to that of a licensing arrangement that excludes the former from S 541's property definition.

First, an entity selected as a licensee plays a dif ferent role and faces a different set of incentives than does an entity chosen as a HUD-type grantee. Ordinarily, an entity's receipt of a license permits the entity to engage in federally regulated activities for its own profit. In other words, the benefits of the license accrue primarily to the licensee itself. In contrast, an entity chosen as a HUD-type grant r ecipient is not itself the beneficiary, but acts as an intermediary administering those moneys for the benefit of the ultimate recipients of the federal assistance. Put another way, unlike the licensee, the grantee's position is more akin to that of "a trustee, custodian, or other intermediary, who lacks beneficial title and is merely an agent for the disbursal of funds belonging to another." In r e Joliet-Will County Cmty. Action Agency, 847 F.2d 430, 432 (7th Cir . 1988). In this latter situation, as compared to a typical licensing arrangement, the federal government will likely possess a weightier supervisory interest in ensuring that the grantee administers the moneys it receives in an ef fective and efficient manner so that the ultimate beneficiaries receive the full measure of the federal assistance intended for them.

Furthermore, as a practical matter , we do not believe that a grantee's interest in a HUD-type grant arrangement is as easily bought and sold--and thus as readily capable of serving as a source of funds from which the debtor's creditors can be paid--as is a debtor's inter est in a government-issued license. For example, in Central Arkansas Broadcasting, the FCC-issued radio license found to constitute property of the debtor's estate had been sold and transferred as part of a bankruptcy auction conducted by the trustee. See 68 F.3d at 214. In fact, courts have generally acknowledged that the value of a gover nment-issued license can typically be realized thr ough sale, notwithstanding conditions requiring gover nment approval prior to transfer. See, e.g., Nejber ger, 934 F.2d at 1302 (noting that "in practice, a liquor license can be bought and sold in the market place"); In re T erwilliger's Catering Plus,

31

Inc., 911 F.2d 1168, 1171 (6th Cir . 1990) ("It is undeniable that a liquor license has pecuniary value to its holder since the license enables the holder to sell alcoholic beverages and can be sold for value."). In sharp contrast, our discussion supra at Part II.C. demonstrates the unlikelihood that a grantee's interest in a HUD–type grant relationship would be able to yield any type of value at a bankruptcy auction, especially given the strict r estrictions imposed by federal law over the identity of any potential grantee.

E.

In light of the numerous and varied scenarios under which federal agencies enter into contractual arrangements with private entities, we must be careful to delineate the scope of our holding. As we earlier observed, each time a federal agency executes a contractual agreement with a private party, a federal interest is ar guably implicated, and we certainly do not mean to suggest in our discussion that every right arising out of any such contractual arrangement should be automatically excluded from S 541's property definition. For example, as discussed supra in Part II.D., a licensee's interest in a government–issued license is generally likely to fall within the ambit of the Bankruptcy Code's property definition, given the fact that licenses, unlike grants, typically inure to the dir ect benefit of the recipient (as opposed to other, ultimate beneficiaries), and are generally capable of being bought and sold in the public market.

Moreover, we recognize that agencies of the federal government can and do routinely enter into contracts with private entities that share the features of ordinary commercial agreements. Federal procur ement contracts, typically entered into between government agency purchasers and private suppliers, are one such example.9

---

9. In fact, in our prior case law, we appear to have assumed that the Bankruptcy Code's definition of "property of the estate" would cover federal procurement contracts. For instance, in Matter of West Electronics, Inc., 852 F.2d 79 (3d Cir. 1988), we considered a

32

Our holding is not meant to imply that the rights and interests yielded to private entities by those contracts automatically fall outside the scope of S 541's property definition. Although we need not decide today the question whether a contractual interest arising out of a federal procurement relationship qualifies as property of the debtor's estate within the meaning of 11 U.S.C.S 541, we observe that, in contrast to a grantor/grantee r elationship such as the one entered into between HUD and LSS in this case, a garden-variety federal procur ement contract (for goods or services) generally does not directly further a public-oriented purpose (such as the provision of transitional housing to homeless individuals). Thus, federal procurement contracts appear significantly less likely to implicate a federal concern akin to the weighty federal interests operating in the instant case--i.e., HUD's supervisory interest in ensuring the efficient administration of federal grant moneys by qualified inter mediaries to the ultimate beneficiaries of the grant.

The absence of a significant, direct public-oriented objective undergirding a procur ement contract relationship is evident from the language of the Federal Grant and Cooperative Agreement Act of 1977 (FGCAA), curr ently codified at 31 U.S.C. SS 6301-08.10 The FGCAA's distinction

_____

procurement contract executed between the United States and West Electronics, Inc., under which West obligated itself to furnish the Air Force with missile launcher power supply units. See id. at 80. After suffering financial difficulties, W est filed for Chapter 11 bankruptcy relief, triggering an automatic stay under 11 U.S.C. S 362, and the United States petitioned the bankruptcy court to lift the stay to allow the
government to terminate the contract. See id. at 80-81. Although we reserved a final determination of the issue, we assumed that the automatic stay provision--which under S 362(a) of the Bankruptcy Code extends to "any act to obtain possession of property of the [debtor's] estate," 11 U.S.C. S 362(a)(3) (emphasis added)--would cover the procurement contract at issue in West. See West Elecs., 852 F.2d at 82.

10. Congress enacted the FGCAA in response to agencies' inconsistent and often interchangeable use of assistance instruments such as procurement contracts and grant agr eements. One of the FGCAA's principal stated goals is to

33

between procurement contracts and grant agreements is, in large part, based on the extent to which each contractual arrangement directly furthers a public purpose. The statute characterizes a procurement contract as "the legal instrument reflecting a relationship between the United States Government and . . . [an]other r ecipient when . . . the principal purpose of the instrument is to acquir e (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government." 31 U.S.C. S 6303 (emphasis added). In contrast, the FGCAA describes a grant agreement as

> the legal instrument reflecting a relationship between the United States Government and . . . [an]other recipient when––
>
> (1) the principal purpose of the relationship is to transfer a thing of value to . . . [the] other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) pr operty or services for the direct benefit or use of the United States Government; . . . .

Id. S 6304 (emphasis added). As the FGCAA's provisions recognize, a private party's interest in a federal procurement contract is much less likely to serve a public-oriented purpose, such as the provision of federal assistance to third-party beneficiaries, and thus the federal

_____

prescribe criteria for executive agencies in selecting appropriate legal
instruments to achieve––

(A) uniformity in their use by executive age ncies;

(B) a clear definition of the relationships  they reflect; and

(C) a better understanding of the responsibil ities of the parties to
them . . . .

31 U.S.C. S 6301(2). For an overview of the r elationship between the various federal assistance instruments, and an examination of the legal issues they raise, see generally Jeffrey C. Walker, Note, Enforcing Grants and Cooperative Agreements as Contracts Under the Tucker Act, 26 Pub. Cont. L.J. 683 (1997).

government's interest in the contractual arrangement appears substantially less likely to lead to the exclusion of LSS's interest from S 541's pr operty definition.

F.

In sum, we do not mean to suggest that every grantee's interest in a grant relationship with a federal agency will fall outside the scope of S 541's property definition, for we must be mindful of the fact that Congress intended the Bankruptcy Code's definition of property to sweep broadly. But the Code's property definition is not without limitations, and under certain concededly narr ow circumstances, a federal agency's weighty inter est in overseeing the administration of its grant pr ograms can suffice to keep a grantee's interest outside of the Code's property definition. In this regar d, the touchstone of our analysis is the strength of the federal agency's supervisory interest over the grant program, best measured by the level of agency oversight over the grant relationship preserved in the provisions of the federal grant program.

Controls that are sufficiently extensive, i.e., federal agency retention of strict, pervasive and minute oversight over the identity of the grant recipient and the manner of that recipient's performance, can demonstrate the strength of an agency's federal interest in the ef fective administration of grant moneys, and can lead to the exclusion of the grantee's interest in the grant relationship from its bankruptcy estate. In the case befor e us, HUD's weighty interest, manifested in the extensive supervisory controls imposed by HUD through the pr ovisions of the Homeless Assistance Act, Supportive Housing Rule, and Grant Agreement itself, sufficed to keep LSS's interest in the grant relationship outside of S 541's property definition.

III. Breach of Fiduciary Duty

Our conclusion that LSS's interest in the Supportive Housing Grant relationship with HUD does not constitute property of LSS's bankruptcy estate does not fully dispose of the merits. There is an issue in this case that was not directly considered by either the Bankruptcy or the District

35

Court, and that remains open even in light of our holding that LSS's interest falls outside of S 541's property definition: whether WHO, by assuming LSS's inter est without notifying constituents of the Unsecur ed Creditors Committee of which WHO was a member at the time of the assumption, breached a fiduciary duty to its fellow Committee members.

The Bankruptcy Code authorizes the appointment of a committee of creditors, see 11 U.S.C.S 1102, and grants to such committees the power to investigate debtors, to negotiate a bankruptcy reorganization plan, and to "perform such other services as ar e in the interest of those represented," 11 U.S.C. S 1103(c). We have construed S 1103(c) as implying a fiduciary duty on the part of members of a creditor's committee, such as the present Unsecured Creditors Committee, towar d their constituent members. See In re PWS Holding Corp., 228 F.3d 224, 246 (3d Cir. 2000). A committee member violates its fiduciary duty by pursuing a course of action that furthers its self-interest to the potential detriment of fellow committee members.

On May 28, 1997, about four months after LSS's January 14, 1997 bankruptcy petition, WHO executed a Grant Agreement Amendment with HUD, pursuant to which WHO assumed LSS's interest in the Supportive Housing Program grant relationship. The Grant Agreement Amendment in fact identified WHO as "Successor to Life Service Systems, Inc." LSS had not identified the original Grant Agreement on its Schedule of Assets. At the time it assumed LSS's interest, WHO was serving on LSS's Unsecur ed Creditors Committee. WHO, however, did not disclose the fact that it had assumed LSS's interest in the Supportive Housing Program grant relationship to its fellow Committee members or to the Bankruptcy Court.

By accepting an invitation to sit on the LSS's Unsecured Creditors Committee, WHO clearly incurr ed a fiduciary obligation to its fellow Committee members. The question remaining before us, therefor e, is whether WHO's actions in assuming LSS's interest violated such a duty. The Bankruptcy Court summarily concluded that WHO "breached the fiduciary duty it owed to general unsecured

36

creditors as a result of its membership on the committee of unsecured creditors in that its conduct was blatantly self-aggrandizing." The conduct to which the Bankruptcy Court referred was WHO's assumption of LSS's interest in the Grant Agreement with HUD, without notice to either fellow Committee members or to the Bankruptcy Court. The District Court never reviewed the Bankruptcy Court's fiduciary duty analysis, stating that WHO had not claimed "that the bankruptcy court erred in concluding that WHO breached its fiduciary duty by assuming the LSS' rights under the agreement."

In light of our conclusion above, we are constrained to conclude that both the District and Bankruptcy Courts' analysis of the breach of fiduciary duty issue was incomplete, as neither court considered the important question whether a fiduciary obligation to Committee members can arise in connection with a transaction involving property that falls outside of the debtor's bankruptcy estate. This omission is of course explained by the fact that both the Bankruptcy and District Courts appeared to predicate their breach offiduciary duty analyses on the assumption that LSS's interest in the Grant Agreement with HUD constituted pr operty of the debtor's estate within the meaning of 11 U.S.C.S 541. As discussed extensively in Section II, this assumption was erroneous. Thus, neither court had occasion to consider whether this error would alter its analysis of the fiduciary duty issue.

Moreover, in the initial briefing and at oral argument, the parties to this appeal never addressed this important question, framing the issue before us solely as whether LSS's interest in the Supportive Housing Grant Agreement constituted property within the meaning ofS 541. Both LSS's Trustee and WHO appear to have assumed that the Trustee's action for breach of fiduciary duty would not lie if LSS's interest fell outside of S 541's property definition. In its amicus curiae brief, the Department of Justice (DOJ) challenges this assumption. While arguing at length that LSS's interest in the grant relationship with HUD does not constitute property of its bankruptcy estate, DOJ also contends that WHO violated its fiduciary obligation to fellow

37

Committee members by not disclosing the existence of that interest. In response, WHO asserts that a breach of a fiduciary duty can never occur--in fact, that afiduciary duty can never arise--in connection with the transfer of an item that is not "property of the estate" within the meaning of S 541.

We have problems with both DOJ's and WHO's positions in regard to the breach of fiduciary duty issue. DOJ's argument that a fiduciary obligation was violated notwithstanding the fact that LSS's interest did not constitute property of the estate is less than pellucid. Under the DOJ's theory, WHO's failure to disclose the existence of LSS's interest in the grant r elationship to either the Bankruptcy Court or LSS's creditors materially undermined the ability of the Bankruptcy Court to take the Supportive Housing Program grant into account in formulating a comprehensive Chapter 11 plan for LSS's reorganization. What the DOJ fails to explain, however, is why property that falls outside of S 541's definition, such as LSS's interest in the grant relationship with HUD, has any role in a debtor's reorganization.

At the same time, we are unwilling at this stage, given the scanty briefing and argument on this issue, to adopt WHO's suggested bright-line rule, which would have us declare that a fiduciary obligation can never arise with respect to an item of property not included in S 541's definition. Perhaps situations (which we cannot anticipate here) could exist in which a creditor's active concealment of an item of property that does not qualify as pr operty of the estate for bankruptcy purposes would threaten to undermine the ability of other creditors to receive an equitable distribution of the debtor's remaining assets or the efforts of the bankruptcy trustee to r eorganize the debtor's affairs. In such a circumstance, imposition of a fiduciary obligation may very well further the purposes of the Bankruptcy Code and the general fiduciary pr ohibition against self-dealing.

In light of the fact that both the Bankruptcy and District Courts did not consider these issues, and given the parties' failure to fairly present and addr ess these issues to us, we decline at this stage of the proceedings to r esolve the

question whether WHO breached a fiduciary duty it owed to fellow Committee members by failing to disclose the existence of an item of property--LSS's inter est in the Supportive Housing Grant program--that does not constitute property of the debtor's estate within the meaning of 11 U.S.C. S 541. Rather, we believe the proper course of action lies in remand for further pr oceedings designed to resolve this issue in the first instance. On remand, the court should consider whether afiduciary obligation to fellow unsecured creditors can arise out of a transaction involving an item of property that does not qualify as property of the estate for Bankruptcy Code purposes and, if so, whether, based on the specific facts of WHO's case, WHO breached such a fiduciary duty.

IV. Conclusion

For the foregoing reasons, the judgment of the District Court will be reversed, and the case remanded to the District Court for a determination as to whether WHO breached its fiduciary duty to fellow members of the Unsecured Creditors Committee, in light of the fact that LSS's interest in the Grant Agreement with HUD does not constitute property of LSS's bankruptcy estate. The District Court may of course remand the matter to the Bankruptcy Court for this determination. Parties to bear their own costs.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit