In re COMMUNITY ASSOCIATES, INC.

STATE OF CONNECTICUT, DEPARTMENT OF TRANSPORTATION

v.

Anthony S. NOVAK, Trustee, Community Associates, Inc.

No. 2–92–01094(RLK).
Civ. No. 3:93CV1058(AHN).

United States District Court,
D. Connecticut.

Oct. 27, 1994.

---

Robert L. Marconi, Office of Atty. Gen., Hartford, CT, for plaintiff.

Joel M. Grafstein, Grafstein & Associates, Farmington, CT, for defendant.

## RULING ON APPEAL FROM BANKRUPTCY ORDER

NEVAS, District Judge.

The plaintiff-appellant, the Connecticut Department of Transportation ("Connecticut"), brings this appeal from a final judgment of the U.S. Bankruptcy Court for the District of Connecticut (Krechevsky, C.J.) granting the trustee-appellee, Anthony Novak ("Novak"), possession of three Dodge vans as property of the debtor's estate. Connecticut contends that the Bankruptcy Court erred as a matter of law in holding that three motor vehicles titled in the debtor's name are the property of the debtor's estate under 11 U.S.C.A. § 541 (West 1993). For the reasons that follow, the judgment of the Bankruptcy Court is REVERSED and the case is REMANDED with instructions.

### Facts

The parties do not dispute the Bankruptcy Court's factual findings. Consequently, the following facts are drawn from the Record on Appeal, Ex. 1 [doc. # 23] and the Bankruptcy Court's decision, which is reported at *In re Community Assocs., Inc.,* 153 B.R. 109 (Bankr.D.Conn.1993).

In July 1988 and July 1989, the United States Department of Transportation awarded cash grants to Connecticut pursuant to the Urban Mass Transit Act of 1964, 49 App.U.S.C.A. § 1612 (West Supp.1994). Under the terms of the federal-state grant agreement, Connecticut was to distribute the cash grants to qualified, non-profit organizations for the purchase and operation of specialized vans to transport elderly and disabled persons. Subsequently, Connecticut entered into two separate agreements (the "Agreements") with the debtor, Community Associates, Inc. ("Community Associates"), for the purchase and operation of vans to transport the elderly and disabled in the Waterbury, Connecticut area. In the first agreement dated December 1, 1988, Connecticut made a cash grant in the amount of $22,235 to Community Associates for the purchase of one van. Community Associates used this cash grant to purchase a 1990 Dodge van.[1] In the second agreement dated

---

1. The vehicle identification number of the 1990 Dodge van is 2BFKB3123LK733647. Its license plate number is Connecticut 217–GLE.

May 8, 1990, Connecticut made a cash grant in the amount of $50,000 to Community Associates for the purchase of two vans. Community Associates used the second cash grant to purchase two 1991 Dodge vans.[2]

The Agreements' terms are similar.[3] The first "Whereas" clause states that the federal cash grant was provided pursuant to the Urban Mass Transit Act to "private non-profit corporations and associations for the specific purpose of assisting them in providing transportation services meeting the special needs of elderly and/or disabled persons for whom mass transportation services are unavailable, insufficient or inappropriate ...[.]" The fourth "Whereas" clause states that the "State and [Community Associates] desire to secure and utilize grant funds for the transportation needs of the elderly and/or disabled citizens of the State of Connecticut ...[.]" The fifth "Whereas" clause reiterates that the Agreement provides for the distribution of grant funds "solely for the hereinabove stated purpose...."

Turning to the Agreements' substantive paragraphs, paragraph 1 states that the purpose of the agreement is to enable Community Associates to provide "transportation services to the elderly and/or disabled." Paragraph 2 states that the cash grants are to be used "exclusively" to purchase motor vehicles. Paragraph 4 states that "all Project Equipment ... shall be purchased in accordance with applicable state law and the standards set forth in the Office of Management and Budget Circular ...[ ]" and requires that Community Associates submit to Connecticut proof of purchase and specifies the information that should be contained in the proof of purchase. Paragraph 5 limits Connecticut's maximum monetary contribution to the purchase of the vans to the amount of the

cash grant and requires that unexpended funds be returned to Connecticut. Paragraph 6 requires that Community Associates hold title to the vehicles in its name, but prohibits Community Associates from transferring title. Paragraph 7 requires that the vans be "used for the provision of transportation service in the area and in the manner described in the Project Description of its ... Application for the duration of [their] useful life." It also requires Community Associates to maintain and insure the vehicles. Paragraph 8 states that Community Associates "is not required to return to the State proceeds from the disposition of Project Equipment, regardless of the fair market value at the time the Equipment is sold; however, proceeds from the sale of said Equipment must remain in use for program purposes." Paragraph 9 prohibits Community Associates from assigning the work of transporting the elderly and disabled to a third party. Finally, paragraph 16 permits Connecticut to terminate the Agreements without cause with sixty days notice or with cause upon delivery of written notice if Community Associates

> discontinues the operation of the said Project Equipment in providing transportation to the elderly and/or disabled persons; [Community Associates] takes any action and/or fails to take required action pursuant to the terms of this Agreement without the required approval(s) of the State; [or Community Associates is] declared by competent authority to be incapable of operation under this Agreement.

Paragraph 16 also requires Community Associates to "forthwith return ownership, title and possession ..." of the vans to Connecticut upon termination of the Agreements.

**2.** The vehicle identification numbers of the 1991 Dodge vans are 2B7HB21Y6MK429256 and 2B7KB3123MK430496. Their license plate numbers are Connecticut 27960 and Connecticut 27961, respectively.

**3.** The December 1988 agreement is entitled "Community Associates of Connecticut, Inc. Agreement for a Cash Grant-in-Aid Toward the Purchase of Specialized Motor Vehicle(s) for Service to Elderly and/or Disabled Persons." It also is identified as Agreement No. 10.03–07(88).

The May 1990 agreement is entitled "Agreement Between the State of Connecticut and Community Associates of Connecticut, Inc. for a Cash Grant-in-Aid Toward the Purchase of Specialized Motor Vehicle(s) for Services to Elderly and/or Disabled Persons." It also is identified as Agreement No. 8.21–02(89). The Agreements' terms are identical, but certain paragraphs are numbered differently. For the purposes of this ruling, the court will refer to the terms and paragraph numbers of the May 1990 agreement.

On March 23, 1992, Community Associates filed a Chapter 11 petition and ceased using the vans to transport the elderly and disabled. On October 29, 1992, the Bankruptcy Court converted the case to a Chapter 7 action. Connecticut filed its complaint to recover possession of the vehicles on December 9, 1992. On April 12, 1993, the Bankruptcy Court denied Connecticut's motion for summary judgment, granted Novak's cross-motion for summary judgment and entered judgment that the vans were the property of the debtor's estate.

### Standard of Review

■ A district court has jurisdiction to hear appeals of final bankruptcy orders pursuant to 28 U.S.C.A. § 158(a) (West 1993). In exercising its appellate jurisdiction, the court reviews the Bankruptcy Court's conclusions of law *de novo* and its findings of fact under a clearly erroneous standard. *See In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988–89 (2d Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991). Here, the Bankruptcy Court has issued a final order and the court therefore may exercise its appellate jurisdiction. Because Connecticut contends on appeal that the Bankruptcy Court erred as a matter of law, not that its factual findings are clearly erroneous, the court will review the Bankruptcy Court's legal conclusions *de novo*.

### Discussion

■ Connecticut asserts that the vans purchased by Community Associates pursuant to the cash grants are the property of Connecticut, not the property of the debtor's estate.[4] (*See* Br. of Pl.–Appellant, at 5–6 [doc. # 7].) Thus, according to Connecticut, the vans are not subject to sale to pay Community Associates' creditors and must be returned to the state. (*See id.*) In response, Novak contends that the vans are the property of the debtor's estate under 11 U.S.C.A. § 541.[5] (*See* Br. of Def.–Appellee Community Associates, Inc., at 5 [doc. # 9].) Consequently, according to Novak, any proceeds from the sale of the three vans may be used to pay Community Associates' creditors. (*See id.*)

The property of a debtor's estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C.A. § 541(a). Although the term legal or equitable interest is broadly construed, *see United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205, 103 S.Ct. 2309, 2314, 76 L.Ed.2d 515 (1983), property in which the debtor holds "only legal title and not an equitable interest ... becomes property of the estate under section (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C.A. § 541(d).

■ No court within the Second Circuit appears to have decided the issue of whether personal property purchased with federal grant monies is an asset of a debtor's estate, and thus within a bankruptcy trustee's power to distribute, or whether such property is an

---

**4.** Alternatively, Connecticut argues that, even assuming the vans are the property of the debtor's estate, the state has an equitable "reversionary interest" pursuant to the Urban Mass Transit Act and the Agreements' terms. (*See* Br. of Pl.–Appellant, at 10.) Because the court holds that the vans are not the property of the debtor's estate, the court does not reach this question.

**5.** Novak also asserts that Connecticut merely has an interest in the "nature of a lien" on the vans or the proceeds of their sale and argues that, under paragraph 4 of the Agreements, Connecticut was required under Connecticut law to file a security agreement in the vans to perfect its security interest. (*See* Br. of Def.–Appellees, at 9–15) (citing Conn.Gen.Stat. § 42a–9–302(1)(d)) Absent filing, according to Novak, Connecticut

possesses an unperfected security interest that is subordinate to his interest as the bankruptcy Trustee and to the interests of secured creditors. (*See id.*) (citing Conn.Gen.Stat. § 42a–9–301(3)) This argument is unpersuasive. The plain language of paragraph 4 describes required purchasing procedures and documentation of purchase, not the filing of security agreements to preserve a security interest in property. It also does not contain language suggestive of lien requirements. *Cf. In re Southwest Citizens' Org. for Poverty Elimination*, 91 B.R. 278, 287 (Bankr. D.N.J.1988) (rejecting bankruptcy Trustee's argument that government required to obtain and file security interest in vehicles and holding that government possessed "reversionary interest" greater than Trustee's interest in property under 11 U.S.C. § 544).

asset of the federal government and of the state agencies to which the federal government made the grants for distribution to private, non-profit organizations such as Community Associates. The only reported decision of a United States Circuit Court of Appeals on this question is *In re Joliet–Will County Community Action Agency*, 847 F.2d 430 (7th Cir.1988).

In *Joliet–Will*, the Seventh Circuit held that unexpended federal and state cash grants, as well as the personal property purchased with such grants, were not the assets of the estate of a bankrupt private, non-profit community organization and could not be sold to pay estate administration expenses. *See id.* at 432. In reaching this holding, the court examined the terms of the grant agreements to determine whether the agreements

> constituted Joliet–Will a trustee, custodian, or other intermediary, who lacks beneficial title and is merely an agent for the disbursal of funds belonging to another? If so, the funds (and the personal property bought with them) were not assets of the bankrupt estate. Or were the grants more like payment under a contract for promised performance not actually performed? The promisee would have a contractual claim for the return of the money he had paid, but would not have a property right in the money.

*See id.* (citations omitted).

In concluding that the organization was "a trustee, custodian, or other intermediary, who lacks beneficial title and is merely an agent", *id.*, and that unexpended funds and personal property purchased with the grant funds were not the property of the debtor's estate, *id.*, the Seventh Circuit considered four factors. First, the Seventh Circuit examined whether the grants imposed "minute controls" on the use of the funds. *See id.* Second, the *Joliet–Will* court considered whether the "nature of the grantor-grantee relationship [was] such as to constitute the grantee in effect an agent designated to perform specific tasks rather than a borrower, or an entrepreneur using invested funds." *Id.* Third, the court noted that the federal statute authorizing the grant program did not authorize either the federal or the state

government "to allow appropriated funds to be used to pay creditors of a private organization unless the creditor incurred an expense specifically authorized by the grants and relevant regulations." *Id.* Fourth, the court examined existing case law holding that federal funds held by a grantee remained the property of the federal government unless and until the funds are expended according to the terms of the grant. *See id.* at 432–33. Last, and least according to the *Joliet–Will* court, the court noted that existing federal criminal law treated thefts of federal grant money or personal property purchased with federal grant money as violations of federal law. *See id.* at 433.

In declining to follow *Joliet–Will*, the Bankruptcy Court held that the Agreements' restrictions on the use of the vans were insufficient to establish that the vans were the property of Connecticut. *See Community Assocs.*, 153 B.R. at 112. Further, the Bankruptcy Court construed the Seventh Circuit's statement that the government's intention to distribute the unexpended cash grants and the proceeds of the sale of the personal property bought with the grants to the organization's creditors was a "clincher", *see Joliet–Will*, 847 F.2d at 431, as a significant factor in the *Joliet–Will* analysis. *See id.* ("More significantly, in terms of the *Joliet–Will* analysis, [Connecticut] does not intend to share the value of the vehicles with any of the debtor's numerous creditors.") While the Bankruptcy Court correctly noted that, unlike Illinois in *Joliet–Will*, Connecticut does not intend to share the value of the three vans with Community Associates's creditors, the court finds that the Bankruptcy Court misapplied the *Joliet–Will* factors.

The Agreements between Connecticut and Community Associates impose "minute controls" on Community Associates' use of the grant funds and the use of the vans themselves. Like *Joliet–Will*, Community Associates was not permitted to switch unexpended funds to different programs. *See Joliet–Will*, 847 F.2d at 432. Paragraph 2 of the Agreements requires that Community Associates "exclusively" use the cash grants to purchase vehicles to transport the elderly and disabled. (*See* Record on Appeal, At-

tach. to Ex. 1.) While paragraph 5 limits Connecticut's maximum monetary contribution to the purchase of the vans to the amount of the cash grants, it also requires Community Associates to return any unexpended funds to the state. (*See id.*) Further, although the Agreements required Community Associates to maintain and insure the vehicles using its own funds, they required that Community Associates purchase insurance sufficient to cover liability and material damage to the vans as well as to indemnify Connecticut against all claims. (*See id.*) Moreover, the Agreements required Community Associates to return to Connecticut any proceeds recovered from insurance claims unless the monies were used to repair the vans. (*See id.*) Similarly, Community Associates was "not required to return to the State proceeds from the disposition of Project Equipment, regardless of the fair market value at the time the Equipment is sold; however, proceeds from the sale of said Equipment must remain in use for program purposes." (*See id.*)

The Agreements' terms also required Community Associates to perform one specific task—the transportation of the elderly and disabled—and narrowly defined the manner in which Community Associates could perform that task. While the "Whereas" clauses of the Agreements clearly indicate the purpose of the grants, (*see id.*), paragraph 7 expressly limits Community Associates's use of the vans to transporting the elderly and/or disabled within the Waterbury area "for the duration of [the vans'] useful life." (*See id.*) Further, paragraph 6 prohibits Community Associates from transferring title to the vans to a third party. (*See id.*) Indeed, not only was Community Associates prohibited from transferring title, but it also was prohibited, under paragraph 9, from assigning the work of transporting the elderly and/or disabled to a third party. (*See id.*) The Agreements also do not contain terms traditionally indicative of a borrower-lender relationship, such as loan, financing agreement, lender, borrower, repayment, installment, or the like.

More important, as in *Joliet–Will,* Connecticut could require Community Associates to "forthwith return ownership, title and pos-

session ..." of the vans to Connecticut upon termination of the Agreements. (*See id.*) Under paragraph 16, the Agreements could be terminated without cause with sixty days notice or with cause upon delivery of written notice. (*See id.*) "In these circumstances, the grantee's ownership is nominal, like a trustee's." *Joliet–Will,* 847 F.2d at 430; *see also In re Alpha Ctr., Inc.,* 165 B.R. 881, 884 (Bankr.S.D.Ill.1994).

Community Associates more closely resembled an agent or intermediary performing a discrete task than a borrower or investor exercising its discretion in using the federal cash grants. While Community Associates held legal title to the vans purchased with the cash grants, it could exercise little discretion in using either the cash grants or the vans purchased with the cash grants. *See Alpha Ctr.,* 165 B.R. at 884 (holding that non-profit corporation possessed only bare legal title in van purchased with state grants such that van was not property of debtor's estate); *see also Yonkers Bd. of Educ. v. Richmond Children's Ctr., Inc.,* 58 B.R. 980, 983 (S.D.N.Y.1986) (holding that debtor educational facility was "constructive trustee" of funds held for sole benefit of mentally handicapped school children attending Yonkers's schools and instructing bankruptcy court to exclude such funds from debtor's estate). Indeed, Connecticut retained the right to recover the vans upon request.

Turning to the third *Joliet–Will* factor, section 1612(a) of the Urban Mass Transit Act (the "UMTA") "declares [it] to be the national policy" that transportation facilities and services be provided for elderly and disabled persons. *See* 49 App.U.S.C.A. § 1612(a). To further this objective, the UMTA authorizes the Department of Transportation to make grants and loans to states and local public bodies to assist them in providing mass transportation services to the elderly and disabled. *See id.* § 1612(b). These loans and grants are subject to the "terms, conditions, requirements, and provisions applicable to grants and loans made under section 1602(a)" of the UMTA. *See id.* Neither section 1602(a) nor section 1612 authorizes the federal government or a state government receiving federal loans and

grants pursuant to the UMTA "to allow appropriated funds to be used to pay creditors of a private institution unless the creditor incurred an expense specifically authorized by the grants and applicable regulations." *See Joliet–Will*, 847 F.2d at 432. Here, Novak seeks to distribute the proceeds of the sale of the vans to Community Associates's creditors who have incurred expenses unrelated to the vans and not specifically authorized by the grant Agreements.

The court also finds persuasive the reasoning underlying *Joliet–Will*'s fourth factor. The court notes that the Seventh Circuit did not draw a distinction between unexpended government funds and personal property purchased with government funds; both were deemed assets of the government, not the property of the debtor's estate. Rather, the *Joliet–Will* court applied existing precedent concerning the status of unexpended government funds to property purchased with such funds. *See, e.g., Palmiter v. Action, Inc.*, 733 F.2d 1244 (7th Cir.1984) (holding that federal monies held by non-profit organization not subject to garnishment proceedings until expended as statutorily required); *Henry v. First National Bank*, 595 F.2d 291, 308–309 (5th Cir.1979) (refusing to allow garnishment of non-profit community organization's unexpended federal grants or property bought with federal grants to satisfy state court monetary award); *Buchanan v. Alexander*, 45 U.S. (4 How.) 20, 11 L.Ed. 857 (1846) (holding that sailors' creditors could not garnish wages because "[u]ntil paid over by the agent of the government to the person entitled to it, the fund cannot, in any legal sense be consider part of [the sailors'] effects"). Courts subsequently applying *Joliet–Will* also have not distinguished personal property purchased with government grants from unexpended government funds, *see, e.g., Alpha Ctr.*, 165 B.R. at 881 (holding that non-profit corporation possessed only bare legal title to van bought with government cash grant such that van should not be included in debtor's estate); *Southwest Citizens'*, 91 B.R. at 278 (holding that federal agency had "reversionary interest" in property purchased with federal grant funds superior to bankruptcy trustee's interest such that agency could require transfer of property from debt-

or's estate), and Novak does not argue that these two categories of property should be treated differently.

In sum, Community Associates was "merely an agent for the disbursal of funds belonging to another." *Joliet–Will*, 847 F.2d at 430. Accordingly, the court holds that the three vans purchased pursuant to the Agreements are not the property of the debtor's estate.[6]

### CONCLUSION

Based on the foregoing, the judgment of the Bankruptcy Court is REVERSED and the case is REMANDED. The Bankruptcy Court is instructed to order the trustee to return ownership, title and possession of the three motor vehicles described herein to the Department of Transportation of the State of Connecticut forthwith.

SO ORDERED.

---

6. At oral argument, the parties informed the court that Community Associates purchased the vans using only the amounts provided by the Agreements and that no other monies were used to purchase the vans. Counsel also informed the court that the vans have not been sold. Consequently, the court does not need to devise an equitable division of the ownership of the vans and simply may direct that the three Dodge vans be returned to Connecticut.