In re LAN TAMERS, INC., Debtor.

City of Springfield, Plaintiff,

v.

Lan Tamers, Inc., The Bank of Western Massachusetts, Educational Technology, Inc., and Universal Service Administrative Company, Defendants.

Bankruptcy No. 02–43147.
Adversary No. 02–4194.

United States Bankruptcy Court,
D. Massachusetts.

Aug. 16, 2002.

Joseph B. Collins, Hendel & Collins, P.C., Springfield, MA, for The City of Springfield.

Martin O'Connell, Morisi & O'Connell, Springfield, MA, for Lan Tamers, Inc.

Jerry B. Plumb, O'Connell & Plumb, P.C., Springfield, MA, for The Bank of Western Massachusetts.

Mark H. Bluver, Shatz, Schwartz & Fentin, P.C., Springfield, MA, for Educational Technology, Inc.

Amanda C. Ellis, Mirrick O'Connell, DeMallie & Lougee, LLP, Worcester, MA, for Universal Service Administrative Company.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court is a complaint filed by the City of Springfield (the "City") against Lan Tamers, Inc. (the "Debtor"), the Bank of Western Massachusetts (the "Bank"), Educational Technology, Inc. ("ETI") (collectively "the Creditors") and the Universal Service Administrative Company ("USAC"). The Complaint seeks, inter alia, a declaration that certain reimbursement funds to be paid to the Debtor by USAC for work performed on the City's behalf are not property of the estate, but rather the property of the City.

A trial on this matter was held on June 13, 2002. No material facts are really in dispute.[1] The question is not how much is owed, but instead who owns the proceeds of the federal grant administered by USAC—the Debtor (and the estate) or the City. For the reasons set forth below, the Court rules that the Debtor holds the promised federal reimbursement in resulting trust for the benefit of the City. Alternatively, the Court rules that the Debtor holds the grant under a constructive trust for the City. Accordingly, those funds, when received, shall not constitute property of the Debtor's bankruptcy estate.

## I. FACTS

The Universal Service Fund (the "Fund") is a funding mechanism mandated and expanded under the federal Telecommunications Act of 1996, 47 U.S.C. § 254 (2002), (the "Act"). The fund is generated through mandatory contributions from "all telecommunications companies in the United States, including all local and long distance telephone companies, wireless and paging companies and payphone providers." Stipulation at ¶ 19; 47 U.S.C. § 254(d). The Act's central purpose is to "ensure that health care providers for rural areas, elementary and secondary school classrooms, and libraries have affordable access to modern telecommunications services...." *Texas Office of Pub. Util. Counsel v. F.C.C.*, 183 F.3d 393, 441 (5th Cir.1999) (quoting H.R.Rep. 104–458, at 132 (1996), *reprinted in* 1996 U.S.C.A.A.N. at 124, 144).

Among the Act's various goals is the support of telecommunications services, networking and internet access for schools and libraries. This support, denominated the E-rate discount, is offered either by requiring that service providers who are mandatory contributors to the Fund confer discounts to applicants or by providing applicants with reimbursement from the Fund when other qualified service providers are used. 47 U.S.C. § 254(h)(B);[2] 47 C.F.R. § 54.501 (2002). The level of E-rate discounts or reimbursements is largely dependent on the economic condition of the target area. In areas of lower income, the discount or reimbursement is higher; in areas of higher income, the discount or

---

1. All of the parties except USAC filed a Stipulation as to facts which they considered uncontested (hereinafter, the "Stipulation").

2. 47 U.S.C.A. § 254(h)(B) provides in relevant part:
   All telecommunications carriers ... shall provide ... services to elementary, secondary schools, and libraries for education purposes at rates less than the amounts charged for similar services to other parties. A telecommunications carrier providing service under this paragraph shall—
   (i) have an amount equal to the amount of the discount treated as an offset to its obligation to contribute to the mechanisms to preserve and advance universal service, or
   (ii) ... receive reimbursement utilizing the support mechanisms to preserve and advance universal service.

reimbursement is lower. 47 C.F.R. § 54.505 (2002).

## A. Universal Service Fund Reimbursement Mechanism

The Fund is administered by USAC, a non-profit corporation, under the auspices of the Federal Communications Commission ("FCC"). 47 C.F.R. § 54.702 (2002). The procedures for applying for reimbursement are set forth in the FCC's regulations and the USAC manual. *See* 47 C.F.R. § 54.504 (2002); USAC application procedure guide, *available at* http://www.sl.universalservice.org/apply/.

A qualifying entity seeking discounted service for improvements in the telecommunications capability of a school or library begins by obtaining approval by USAC's Schools and Libraries Division (the "SLD"). After a competitive bidding process, the applicant must submit an application detailing the nature and scope of the project. 47 C.F.R. § 54.504(a), (b). Upon obtaining initial approval, a contract is signed with the chosen service provider and a final application submitted, specifying the method of payment. 47 C.F.R. § 54.504(c). USAC's SLD then conducts a further review, and determines whether a funding commitment letter will be issued.

If the project is accepted, and reimbursement from the Fund is required and available, two alternative methods of payment for the project are permitted under the regulations. Under the most commonly used method, the Service Provider ("SPI") method, the applicant pays only its discounted share to the service provider; the balance of the invoice is paid or credit-ed to the service provider by USAC. However, situations occasionally arise where the SPI method of payment is impractical. For example, if the project is accepted by USAC but *not* yet funded, the applicant may wish to go forward without delay and await the funding by way of reimbursement. The SPI payment method may also be impractical if project approval is actually denied by USAC and the applicant wishes to appeal to the FCC, but go forward with the project in the interim and undertake the risk that its position is not upheld. In such cases, applicants may choose the Billed Entity Reimbursement ("BEAR") method of payment.

Under the BEAR method, the applicant pays all of the vendor's invoice in advance. *See* Form 472 (BEAR) Filing Guidance, *available at* http://www.sl.universalservice.org/reference/8bear.asp. When and if a USAC funding commitment letter is later obtained, the service provider may then bill USAC for the reimbursement. Upon receipt of the funds, the service provider must promptly remit that sum to the applicant. *Id.*

Regardless of the method of payment chosen, reimbursement checks are made payable to the order of the service provider. USAC/SLD Service Provider Manual, Chapter 9 at 2–3, *available at* http://www.sl.universalservice.org/vendor/manual/chapter9.doc.[3] Where the service provider enters into E-rate contracts with several applicants, a single reimbursement check is issued for the total amount owed under all of its contracts. *Id.* From this total amount, the service provider must then calculate the corre-

---

**3.** Serv.Prov. Manual, Ch. 9 provides in relevant part:

The check is made out in the name of the service provider and may include payment amounts due to many applicants. That is, if your payment file included [applications] from 6 different applicants that all submitted BEARs, you would receive one check for the grand total of all 6 payments due … the Service Provider is responsible for passing the reimbursement amount through to the applicant(s).

sponding amount to be passed through to applicants who have chosen the BEAR payment method. *Id.*

USAC's reimbursement procedures unequivocally state that where the BEAR payment method applies, the service provider acquires no rights of ownership in the proceeds of the reimbursement. Indeed, in order to obtain the reimbursement, the applicant must submit FCC (BEAR) Form 472, which contains the following required acknowledgment by the service provider's authorized representative:

I am authorized to submit this Service Provider Acknowledgment for this Billed Entity Applicant Reimbursement Form, and acknowledge to the best of my knowledge, information and belief as follows:

I. The service provider must remit the discount amount authorized by the fund administrator to the Billed Entity Applicant who prepared and submitted this Billed Entity Applicant Reimbursement Form as soon as possible after the fund administrator's notification to the service provider of the amount of the approved discounts on this Billed Entity Applicant Reimbursement Form, but in no event later than 10 calendar days after receipt of the reimbursement payment from the fund administrator, subject to the restriction set forth in B. below.

II. The service provider must remit payment of the approved discount amount to the Billed Entity Applicant prior to the tendering or making use of the payment issued by the Universal Service Administrative Company to the service provider of the approved discounts for the Billed Entity Applicant Reimbursement Form.

FCC (BEAR) Form 472, Block 4, *available at* http://www.sl.universalservice.org/form/# vendor.

Furthermore, in the USAC Service Provider Manual, the following language appears as specific guidance to service providers:

Although the BEAR form is essentially an Applicant Form, it does require a signature from the Service Provider in Block 4. The purpose of this signature is to ensure that the Service provider is aware of the requirement that the Service Provider turn over the BEAR reimbursement amount (to the applicant) within 10 days of receipt of the check. *The Service provider functions merely as a vehicle to deliver the reimbursement back to the applicant.* Failure to provide the reimbursement in a timely fashion may result in the Service Provider facing enforcement action.

USAC/SLD Serv.Prov. Manual, Ch. 9 at 1, (emphasis supplied).

B. The City's Application Process

On April 1, 1999, the Debtor entered into a contract with the City to furnish and install certain network wiring in the City's Central High School (the "Central High School Project"), for the total price of $1,096,180.28. The work was performed and the Debtor was paid in full by the City. The City also entered into a separate contract with the Debtor in early 2001 to deliver certain network maintenance services for a one (1) year period to four other of the City's schools (the "Network Maintenance Project"), for a total price of $134,000.00. The Debtor completed the work, and was paid in full by the City.

Prior to the commencement of the Central High School Project, application was made to USAC for project approval from the Universal Service Fund. USAC declined for reasons not relevant here. The

City appealed USAC's adverse determination to the FCC, but proceeded with the project in the interim. Ultimately, the City prevailed by order of the FCC, dated March 5, 2001. By letter of January 18, 2002, USAC acknowledged that, based on the FCC's action, USAC would reprocess the City's request for reimbursement from the Universal Service Fund and would issue a funding commitment letter. USAC's funding commitment letter, authorizing a reimbursement of 87%, or $953,285.34, followed on April 12, 2002.[4]

The Network Maintenance Project took a different path. Here, when application was made, USAC approval was given, but USAC did not then provide a funding commitment. As was the case with the Central High School Project, the City could not wait and moved ahead, paying the Debtor up front for its services. The USAC funding commitment finally arrived on February 8, 2002 in the amount of $116,771.40, or 87% of the amount that the City had already paid to the Debtor.

With funding commitments from USAC in hand, the City, on April 17, 2002, filed its respective Forms 486 (certifying, inter alia, that the services from the Debtor had indeed been received) and respective BEAR forms for the Central High School and Network Maintenance Projects. Accordingly, the City sought from USAC reimbursements in the amounts of $953,285.34 for the Central High School Project and $116,771.40 for the Network Maintenance Project, for a total $ 1,070,056.74 (the "Reimbursements").

In accordance with USAC procedural requirements, the BEAR forms were executed by both the City and the Debtor. Payment would be made to the Debtor service provider, subject to the signed certification made by the Debtor's authorized representative in Block 4 of the BEAR application form submitted. Thus, pursuant to the terms of the BEAR form (its overly clumsy language aside), the Debtor was obligated to remit the funds received from USAC to the City as soon as possible after receipt, and certainly no later than 10 calendar days thereafter. Further, under no circumstances was the Debtor permitted to employ those funds for its own use.

On May 20, 2002, after the City's submission of the BEAR forms, but before the Debtor's receipt of funds from USAC, the Debtor filed a Petition in this Court under Chapter 11 of the Bankruptcy Code. The Chapter 11 case was filed to forestall injunctive relief sought by ETI, a substantial unsecured creditor, in the United States District Court for the District of Massachusetts.

Shortly after the case filing, the Debtor sought leave from this Court to use the cash collateral of the Bank of Western Massachusetts (the "Bank"), pursuant to 11 U.S.C. § 363(2)(B). The Bank claimed to hold a security interest in substantially all of the Debtor's assets, including its receivables, to secure payment of approximately $300,000.00. In conjunction with the first interim hearing on the Debtor's request to use the Bank's cash collateral, held on May 23, 2002, the Debtor first mentioned the Reimbursements, but conceded that the monies due were not property of the Debtor. The Debtor characterized itself as a "pass-through" of the funds from USAC to the City. The Bank and ETI disagreed. However, in light of the fact that the secured position of the Bank appeared adequately protected in assets of the Debtor excluding consideration of the Reimbursements, the Court granted interim cash collateral use. The hearing on

---

4. USAC's 10 month delay in responding to the FCC decision and its delay of another three (3) months in issuing the funding commitment letter was not explained.

interim cash collateral authorization was then continued to May 29, 2002 for reasons not relevant here.

On May 29, 2002, the City appeared at the continued cash collateral hearing. It forcefully asserted its claim to the Reimbursements, arguing that they were property of the City and not of the estate. Again, the Bank and ETI, now joined by the unsecured creditors committee, disagreed. The Bank and the Debtor presented the Court with a Stipulation between them under which the Bank would agree to the Debtor's use of cash collateral and acquire a roll-over lien. The Stipulation did not dispose of the Reimbursements question. The Court granted the Stipulation, as amended in form requested by the Court, but further ordered the Debtor not to use the proceeds of the Reimbursements, absent further court order. As for the City's claim of right to the Reimbursements, the Court opined that the City's claim was really a claim of title to (and to recover) an asset, and, therefore, should be asserted by way of an adversary proceeding. *See* Fed.R.Bankr.P. 7001(2).

The instant adversary proceeding was filed by the City on June 4, 2002, naming as defendants the Debtor, the Bank, ETI and USAC. The City's Complaint requests that the Court rule that the Reimbursements are not property of the estate, but property of the City, free and clear of any claim of the Bank or ETI. The Complaint also requests that the Court order USAC to remit payment to the City by a time certain. In addition, the Bank has counterclaimed, asking the Court to determine that it has a perfected security interest in the Reimbursements.

## II  THE POSITIONS OF THE PARTIES

The City begins with a simple proposition. It contends that the Reimbursements are not, and never were, property of the Debtor. The Debtor was paid in full by the City. Although USAC regulations require that USAC remit the funds initially to the service provider, the Debtor was never entitled to retain those funds or use them for its own purposes and was under a duty to remit promptly to the City. The City maintains that regardless of whether the Debtor had a *legal* interest in the Reimbursements, the Debtor had no *equitable* interest therein. Accordingly, pursuant to 11 U.S.C. § 541(d), the Reimbursements are not property of the estate. The City argues further that, even if § 541(d) were not applicable, it would prevail under theories of express, constructive trust or resulting trust, each of which is recognized under Massachusetts law. The Debtor essentially agrees with the positions taken by the City.

The Creditors disagree.[5] They argue that the Reimbursements are nothing more than accounts receivable owed by USAC to the Debtor, and the obligation of the Debtor to the City is nothing more than a contract claim held by the City. The Creditors contend that the BEAR form created no fiduciary relationship, and, if it did, neither the FCC nor USAC had the statutory or regulatory authority to create such a relationship.

Absent a statutory or technical trust, the Creditors maintain, no express trust relationship can be created. As for the constructive trust theory advanced by the City, the Creditors contend that such an equitable remedy requires that the City establish both a legal right or interest in

---

**5.** Without comment or opposition by any party, Counsel for the Official Unsecured Creditors Committee participated in the trial. The Court deems the Committee to have intervened, pursuant to Fed.R.Bankr.P. 7024(a)(2).

the Reimbursements and a fiduciary duty owed by the Debtor. They assert that neither exists, and that, even if the City were able to establish itself as a constructive trust beneficiary, its rights would be subject to the those of the Bank (as a bona fide purchaser) and no greater than any other unsecured claimant. Finally, the Creditors argue that the City's position, if upheld, would subvert fundamental notions of creditor equality that constitute underlying policies of the Bankruptcy Code.

USAC agrees with the City ... to a point. USAC agrees that the Reimbursements are not property of the estate. It notes, however, that once the Court has made that determination, the remaining parties in interest are the City and USAC, both non-debtors. The Court is then, USAC maintains, without subject matter jurisdiction under 28 U.S.C. § 1334 to require USAC to make the payment to the City on any time frame other than that chosen by USAC.

## III.  DISCUSSION

█ In order to determine whether the Reimbursements are part of the bankruptcy estate's pool of assets, this Court turns first to the provisions of § 541 of the Bankruptcy Code. That section provides that upon the commencement of a bankruptcy case, an estate is created comprised of "all legal or equitable interests of the debtor ... wherever located and by whomever held." 11 U.S.C. § 541(a) (2002). It is well established that the scope of property to be included under § 541(a) is broad. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983). Section 541(d) of the Code, however, circumscribes the scope of the estate such that

property in which the debtor holds ... only legal title and not an equitable interest ... becomes property of the es-

tate ... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).

█ "It is necessary to examine whether the debtor owns the property absolutely, conditionally, or merely through some lesser relationship, such as a bailment, agency, or consignment, whereby the goods [or funds] actually belong, save for the debtor's right to possession, completely to another." *Central Ins. Co. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.)*, 269 B.R. 481, 487–88 (Bankr. E.D.N.Y.2001) (quoting 5 Collier on Bankruptcy (MB) ¶ 541.06[1][a] (15th rev. ed.2001)). The nature and extent of the debtor's interest in property is determined by applicable non-bankruptcy law. *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

Thus, the characterization of the property interests giving rise to ownership rights in the disputed funds is central to the resolution of whether federal grant funds are part of the Debtor's bankruptcy estate under § 541(d). In its analysis of a closely analogous federal grant scheme, the Seventh Circuit aptly characterized the present problem. In *In re Joliet–Will County Community Action Agency*, 847 F.2d 430, 432 (7th Cir.1988), the court stated that whether federal grants are property of the bankruptcy estate

depends on the terms under which the grants were made. Did [the terms] constitute [the debtor] a trustee, custodian or other intermediary, who lacks beneficial title and is merely an agent for the disbursal of funds belonging to another? If so, the funds were not assets of the estate.... Or were the grants more like payment under a contract for promised performance not actually performed?

The promisee would have a contractual claim for the return of the money he had paid, but he would not have a property right in the money.

Accordingly, the Court must first categorize the nature of the property interests in play. Here, to the extent that both legal and equitable title in the Reimbursements rest in the Debtor under non-bankruptcy law, the City will be limited to a claim against the estate subject to the same pro-rata treatment provided to similarly situated unsecured creditors. *See Cent. Ins. Co.*, 269 B.R. at 487–88. On the other hand, if the Debtor holds only bare legal title as a conduit channeling federal grants to the City, the funds are out of the reach of the Debtor's creditors pursuant to § 541(d).

### A. The Nature of Property Interests Arising Under the Universal Service Program

The Creditors posit that the City "entered into a contract with the Debtor, which provided a contractual expectation of payment . . . i.e., that [it] would [be] paid for goods and services provided to the Debtor." Under this logic, the Debtor entered into a contract with the City to remit the Reimbursements once issued by USAC. Therefore, they maintain that the City is a general unsecured creditor holding a contract "claim" against the Debtor within the meaning of 11 U.S.C.

§ 101(5)(A).[6] *See In re CRS Steam*, 225 B.R. 833, 840 (Bankr.D.Mass.1998). The Creditors further characterize the Reimbursements as an "account receivable" of the Debtor.

This Court strongly disagrees with the foregoing characterization of the transactions here involved and rules that the City's rights to the funds fall outside the scope of the Code's definition of "claim" altogether. The Creditors misconstrue the nature of the transactions as well as the parties to the transactions. This confusion is easily resolved, however, once we understand that there are two separate and distinct transactions. Though both stem from a single federal statutory scheme, each transaction vests different property interests arising under state and federal law, respectively.

Under the BEAR payment method, the first transaction arises out the mandate of 47 C.F.R. § 54.504(c) [7], which requires that applicants must enter into private contracts with service providers to qualify for E-rate discounts. It is important to note that neither the FCC nor USAC become a party to such contracts. On the contrary, the FCC regulation is clear that the *applicant* must enter into a service contract with a qualified service provider. *Id.* The service provider's contractual relationship with the applicant is, and should be, governed by state law.

**6.** 11 U.S.C. § 101(5) (2002) defines a "claim" as

(A) right to payment [from the debtor], whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
(B) right to an equitable remedy [against the debtor] for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed,

contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**7.** 47 C.F.R. § 54.504(c) provides:

Filing of FCC Form 471. An eligible school, library, or consortium that includes an eligible school or library seeking to receive discounts for eligible services under this subpart, shall, upon signing a contract for eligible services, submit a completed FCC Form 471 to the Administrator. A commitment of support is contingent upon the filing of FCC Form 471.

The second transactional relationship arising under the BEAR method of payment is the grantor/grantee relationship between USAC and the applicant; namely, the applicant becomes entitled to receive reimbursement from the Universal Service Fund. *See Joliet–Will,* 847 F.2d at 432–33 (finding that federal funds distributed to a non-profit organization created a grantor/grantee relationship whereby the funds remained property of the federal government and thus outside the reach of the recipient's creditors in a bankruptcy case); *Westmoreland Human Opportunities, Inc. v. Walsh (In re Life Serv. Sys., Inc.),* 246 F.3d 233, 236–40 (3rd Cir.2001) (applying the same reasoning to federal funds distributed under the Department of Housing and Urban Development's Supportive Housing program); *Connecticut Dept. of Trans. v. Novak (In re Comm. Assoc., Inc.),* 173 B.R. 824, 828 (D.Conn.1994) (applying the same holding in the context of federal grants distributed to state governments under the Urban Mass Transit Act). This grantor/grantee relationship is exclusively a child of a federal statutory scheme and federal regulation, and is, and should be, governed by federal law.

Under the particular payment mechanism agreed to under the Central High School and Network Maintenance contracts, the obligations of both parties to these contracts were fully satisfied. The Debtor performed the services required under the contracts and the City paid the full value of the services performed. There is no further obligation of the Debtor to the City which could be characterized as a right to payment or an equitable remedy for breach of a performance giving rise to such a right.[8] Accordingly, the City has no "claim" against the Debtor as defined by § 101(5). To the extent that the City had an "expectation of payment" and thus a "claim" at all, it would be a claim against USAC arising out of the City's separate relationship with USAC as a grantee of federal funds under the Universal Service program.

Finally, the Debtor has no claim against USAC, both because USAC was not a party to the Debtor's contract with the City and because the Debtor was, in any event, paid in full for the Central High School and Network Maintenance Projects.[9] The Debtor is owed nothing by USAC. It is the City that is owed money from the Universal Service Fund. Accordingly, the Creditors' characterization of the USAC Reimbursements as accounts receivable due to the Debtor is erroneous.

The only relevant question in the present dispute, therefore, is whether the Debtor has any ownership interest in the Reimbursements arising from the second transaction, namely the grantor/grantee relationship between USAC and the City. For the funds to be deemed property of the estate under § 541(d), the Debtor must

---

**8.** All that remains of the Debtor's obligations to the City are those duties imposed by the FCC's regulations controlling disbursement mechanisms for the federal funds. *But cf. Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.),* 269 B.R. 481, 490 (Bankr.E.D.N.Y.2001) (holding that the debtor's subsidiaries had a right to payment of tax refunds issued to the debtor by the IRS because the refund was subject to a binding allocation agreement between the parent company and its subsidiaries).

**9.** Of course, the situation would be different if the City and the Debtor had adopted the SPI method of payment, where the service provider receives a discounted payment from the applicant and the balance from USAC. However, under those circumstances, the Debtor would be receiving the USAC monies on its own account and would have no claim against or remittance duties to the City.

hold both legal and equitable title in the Reimbursements.

### B. Legal and Equitable Title to the Reimbursements Under § 541(d)

At the outset, this Court concludes that the Debtor has legal title to the Reimbursements. Because all reimbursements owed by USAC are made by check payable to the service provider, the Debtor has at least bare legal title thereto. *See* USAC/SLD Serv.Prov. Manual at 2–3. The more difficult question is whether equitable title to the Reimbursements vests in the Debtor as well. To answer this question, the Court looks to whether the Debtor holds the Reimbursements in trust on behalf of the City. "Because [a] debtor does not own an equitable interest in property [it] holds in trust for another, that interest is not 'property of the estate.'" *Begier v. IRS,* 496 U.S. 53, 58, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990).

■ Neither the Act nor FCC regulations create an express trust relationship between the holders and beneficiaries of reimbursements from the Universal Service Fund. *See Ross v. U.S.,* 148 F.Supp. 330, 332 (D.Mass.1957) (stating that an express trust requires an "affirmative intention manifested by the settlor to create a trust"). *Cf.* 26 U.S.C. § 7501(a) (2002) (providing that revenue taxes collected by intermediaries constitute a special fund in trust for the United States). Indeed, the Act specifically states that the *"telecommunications carrier* shall ... receive reimbursement." 47 U.S.C. § 254(d)(ii) (emphasis supplied); 47 C.F.R. § 54.501(a) ("[t]elecommunications carriers shall be eligible for universal service support...."). However, notwithstanding the absence of express trust language, the Court must determine whether the reimbursements issued under BEAR transactions should be deemed to be held in a resulting or constructive trust on behalf of the grantee school or library. This Court finds in the affirmative.

#### 1. Resulting Trust

■ "A resulting trust arises where a transfer of property is made under circumstances which raise an inference that the person making the transfer or causing it to be made did not intend the transferee to have the beneficial interest in the property transferred." Restatement (First) of Restitution § 160 cmt. b (1936); Restatement (Third) of Trusts § 7, cmt. a. (Tentative Draft No. 1, 1996); *Ross,* 148 F.Supp. at 332. *See also, In re Monarch Capital Corp.,* 130 B.R. 368, 376 (Bankr.D.Mass. 1991).

The terms of the BEAR transaction satisfy the requirements of a resulting trust. Although the language of the Act and its underlying regulations create convoluted, cumbersome reimbursement mechanisms, it is clear from the FCC forms and USAC procedures that the service provider is not intended to hold beneficial title to the funds under the BEAR payment method. From the very outset of the BEAR transaction, the service provider is made aware of its duty to remit the reimbursement proceeds to the applicant within 10 days of receipt. *See* BEAR Form, Block 4.

Furthermore, the language in the USAC Service Provider Manual creates a strong inference that USAC intended that the beneficial interest in the reimbursed funds would not inure to the service provider. The USAC Service Provider Manual clearly states that the service provider "functions merely as a vehicle to deliver the reimbursement back to the applicant." USAC/SLD Serv.Prov. Manual Ch. 9 at 1. Moreover, by providing that the service provider's failure to promptly remit the funds to the beneficiary will result in enforcement action, USAC has unequivocally

expressed its intention that equitable title to the reimbursement shall vest in the applicant, not the service provider. *Id.* Accordingly, the Debtor here does not have equitable title in the Reimbursements because it holds the funds in a resulting trust for the City.

### 2. Constructive Trust

Alternatively, the Court holds that the Debtor lacks equitable title in the Reimbursements because it holds the funds under constructive trust for the benefit of the City.

#### a. Applicable Law

■ Both the City and the Creditors view the application of a constructive trust to be controlled by state law. Under Massachusetts law, a court may apply a constructive trust approach only where the plaintiff has established that the property in dispute was acquired by fraud, mistake, breach of duty, or in other circumstances indicating the holder would be unjustly enriched. *Fortin v. Roman Catholic Bishop,* 416 Mass. 781, 625 N.E.2d 1352, 1357–58 (1994). The Creditors claim that the City cannot meet this burden because no fiduciary relationship exists between the Debtor and the City and no affirmative wrongdoing by the Debtor can be established to support a finding of unjust enrichment.

■ The Court, however, believes that the more expansive federal common law standard of constructive trusts should apply in this case. *See EBS Pension L.L.C. v. Edison Bros. Inc. (In re Edison Bros., Inc.),* 243 B.R. 231, 236 (Bankr.D.Del.2000) (displacing state constructive trust law which required showing of fiduciary duty and fraud in determination of whether ERISA funds were property of the debtor under § 541(d)). As did the Third Circuit in *Official Committee of Unsecured Creditors v. Columbia Gas Systems, Inc. (In re Columbia Gas Sys., Inc.),* 997 F.2d 1039, 1059–60 (3rd Cir.1993), *cert denied* 510 U.S. 1110, 114 S.Ct. 1050, 127 L.Ed.2d 372 (1994), this Court believes that the federal interests involved in the FCC's regulatory distribution of federal funds merit application of federal common law. A matter relating to the federal treasury raises "a uniquely federal question." *United States v. Swiss Am. Bank,* 191 F.3d 30, 42–43 (1st Cir.1999) citing to *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) ("[S]ince *Clearfield,* courts have often looked to federal common law to protect various proprietary interests of the United States."). "It is axiomatic that federal law governs questions involving the interpretation of a federal [regulation]. . . .". *Columbia Gas,* 997 F.2d at 1055.

■ In *Columbia Gas,* the Third Circuit followed the Supreme Court's directive in *United States v. Kimbell Foods,* 440 U.S. 715, 727–28, 99 S.Ct. 1448, 1458–59, 59 L.Ed.2d 711 (1979), in order to ascertain whether federal common law should displace state law. This "determination depends on the nature and importance of the government interest at issue and the effect of applying state law." *Id.; Swiss Am. Bank,* 191 F.3d at 44 (quoting *Kimbell Foods*). Three factors must be considered: (1) the need for a nationally uniform law; (2) whether incorporation of state law would frustrate specific objectives of the federal program at issue; and (3) the extent to which application of a federal common law rule would upset commercial expectations that state law would govern. *Id.*

All of the *Kimbell Foods* factors are satisfied in this case. There is a clear need for a uniform federal standard because the Universal Service Fund forms part of a federal statutory scheme de-

signed to elevate and equalize the nation's telecommunications capability. Indeed, no state agency, but rather the FCC, a federal agency, exercises the sole regulatory oversight. Applying state law would frustrate Congress' objective of providing affordable telecommunications services where such services would not be available without federal grants.[10] Further, those complying with the various procedures established by USAC and the FCC could have no reasonable expectation that the rights and responsibilities that flowed therefrom would be controlled by state law. Under these circumstances, the property interests in federal funds should not be left to "the vagaries of state trust law." *Columbia Gas*, 997 F.2d at 1055.

### b. Constructive Trusts under Federal Common Law and § 541(d).

Where a statutory scheme devising disbursement of public funds is intertwined with regulations mandating private contractual agreements with third parties, the dichotomy between interests arising directly under the purview of the federal granting statute and those arising under the incidental private agreements can often be obfuscated. In this regard, the Court finds the analysis presented in *Yonkers Board of Education v. Richmond Children's Center (In re Richmond Children's Center)*, 58 B.R. 980 (S.D.N.Y.1986), instructive. Although that case revolved around a state statutory scheme, the facts are closely analogous to the present case.

In *Richmond*, the debtor was a special needs facility located in the City of Yonkers. Although some children in the debtor's care were not residents of Yonkers, they also attended public schools in that city. A state statute provided for reimbursement of tuition fees to cities where non-resident children attended schools. *Id.* at 980–82.

Under the statutory scheme, reimbursement checks were not issued directly to the intended beneficiaries, the respective cities providing public education to non-resident children. Instead, the statute required that each care facility enter into "contracts" with the cities providing that the care facility would transmit the state reimbursement funds to the individual school districts within 10 days of receipt. *Id.* at 982. In *Richmond*, the reimbursement checks issued to the care facility were accompanied by transmittal notes indicating that the checks represented "a pass-through payment to the Yonkers P.S." *Id.* at 981.

The issue in *Richmond*, as here, was whether the pass-through payments were property of the debtor care facility's estate under § 541. The bankruptcy court held that they were. The District Court for the Southern District of New York disagreed. Finding that the care facility was merely an intermediary channeling the funds from one party to another, the court held that the care facility held the reimbursements under a constructive trust for the benefit of the City of Yonkers. *Id.* at 982. The *Richmond* court ruled that the debtor had no beneficial interest in the reimbursement funds and specifically noted that the debtor was being paid for its medical care services under a separate contract. *Id.* The court concluded that "no debt was owed to the city by Richmond; the services provided by Yonkers were solely for the benefit of the children residing in the intermediate care facility, and not for the facility itself." *Id.*

---

**10.** Indeed, the purpose of the Act would be particularly frustrated where, as here, the Debtor would essentially be paid twice for services rendered once and no funds would be available to fund the schools.

The Third Circuit Court of Appeals has applied the same analysis in the context of a federal regulatory scheme. In *Columbia Gas*, 997 F.2d 1039, the Federal Energy Regulatory Commission ("FERC"), acting pursuant to its authority to regulate gas rates under the Nation Gas Act, ordered upstream providers of gas to refund past overcharges to intermediary gas providers. These intermediary gas providers were then to pass these overcharge refunds to the end users, the consumers, who ultimately were the source of the overcharged funds. *Id.* at 1051–52.

The debtor Columbia Gas, an intermediary gas carrier, sought leave from the bankruptcy court to pass the refunds received pre-petition from upstream carriers to its customers. The Third Circuit held that these refunds were not property of the bankruptcy estate under § 541(d) and thus could pass directly to the debtor's customers. *Id.* at 1061. Applying federal common law, the court held that the debtor held the overcharge refunds in constructive trust for the benefit of its customers. *Id.* at 1059–60.

Rejecting the argument that no trust could exist where Congress had not so specifically provided, the Third Circuit reasoned first that Congress intended to include both express and constructive trusts in the limiting language of § 541(d). *Id.* at 1060. It found the following language in the legislative history of the statute instructive:

> Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was *reimbursement*, the payment would actually be held in *constructive trust* for the person to whom the bill was owed.

*Id.* at 1059 (quoting H.R.Rep. No. 95–595, at 368 (1977), *reprinted* in 1978 U.S.C.C.A.N. 5963, 6324) (emphasis supplied). *See also, T & B Scottdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir.1989) *cert denied*, 493 U.S. 846, 110 S.Ct. 139, 107 L.Ed.2d 98 (1989) (stating, in context of contract clause establishing a constructive trust, that "the legislative history of 11 U.S.C.A. § 541 makes it clear that funds in the debtor's possession held for a third-party do not become part of the estate in bankruptcy.").

The court then concluded that the statutory reimbursement mechanism of "paying one entity which then forwards the money to the ultimate intended beneficiary" rendered the debtor a " '*receiving and transmitting agent,*' or a *conduit*, for money upstream suppliers owe to overcharged consumers." *Columbia Gas*, 997 F.2d at 1060–61 (quoting *In re Penn Cent. Transp. Co.*, 486 F.2d 519, 523–27 (3rd Cir.1973) en banc, *cert denied* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974)) (emphasis added); *In re United Milk Prod. Co.*, 261 F.Supp. 766, 768 (N.D.Ill.1966) (holding that under a federal regulation redistributing pooled funds to milk suppliers, the distributing bottler "had no independent right [to refunds] but is merely ... a delivery agent, transferring money from bottling handlers, to the raw milk producers entitled [to these funds].)."

Although the court found no express trust language in the FERC's order or regulations, it concluded that "[the] insurance example [in § 541(d)'s legislative history] evidences that Congress intended that when a debtor is a mere conduit for funds to travel from one party to another, it lacks equitable interest in the monies." *Id.* at 1059. The court found it instructive

that the reimbursements were not payments for services rendered by the debtor. *Columbia Gas*, 997 F.2d at 1060. Equitable interests in the funds did not arise out of a private contractual agreement, but rather were created unilaterally by the FERC. *Id.; Edison Bros.*, 243 B.R. at 237 (holding that property interests in refunds from over-funded ERISA plan were not contractual in nature but arose under federal law). *See also, United States v. McConnell (In re Flying Boat, Inc.)*, 258 B.R. 869, 874 (N.D.Tex.2001) (holding that under statute mandating that travel agencies collect INS inspection fees from passengers, the debtor travel agency did not owe the money for services rendered by the INS but was required to remit it by federal regulation).[11]

Adopting the analysis employed in *Columbia Gas*, this Court is satisfied that, notwithstanding the absence of an explicit statutory or regulatory provision establishing a trust for the Reimbursements, the Debtor must be deemed to hold the federal funds for the benefit of the City under a constructive trust. As established *supra*, in the context of the BEAR payment method, the Reimbursements do not constitute payment to the provider for services rendered; the service provider has already been fully paid under a separate contract. The Debtor is thus merely a conduit responsible for remitting the funds from USAC to the ultimate beneficiary, the City.[12] Accordingly, the Reimbursements are not property of the estate pursuant to § 541(d) of the Bankruptcy Code.

In so holding, the Court is mindful of the Bankruptcy Code's policy of equitable distribution of property among similarly situated creditors, and the awkward fit of constructive trusts within that scheme. *See In re Cox*, 247 B.R. 556, 571–72 (Bankr.D.Mass.2000) (discussing constructive trust conflict with policy of the bankruptcy code and citing to the academic debate as to the fit of constructive trusts in bankruptcy); *Skilled Nursing Prof. Serv. v. Sacred Heart Hosp.*, 175 B.R. 543, 558–50 (Bankr.E.D.Penn.1994) (same). *See also, CRS Steam*, 225 B.R. at 838–40 (discussing different approaches taken by courts implementing constructive trust in bankruptcy); *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443 (6th Cir.1994) (holding that constructive trusts "have no place in bankruptcy.").

Deeming constructive trusts to be a "judicial fiction" designed to fashion an equitable remedy, courts are uneasy in applying constructive trusts within the context

---

**11.** By contrast, the court found that payments the debtor sought to provide the upstream providers for gas purchased pre-petition arose out of a separate contractual obligation for payment of services rendered, and were thus unsecured debts. *Cf. Maine Cent. R.R. v. Boston & Maine Corp. (In re Boston and Maine Corp., Inc.)*, 600 F.2d 307, 308 (1st Cir.1979) (noting that although the interline accounts in *Penn Central* may have been funds held in a constructive trust, use of train cars constituted a rental and thus a debtor/creditor relationship existed).

**12.** In some instances, courts have found that equitable title to the funds never even vests in the grantee entity until it is used for the specific purpose to which they were intended.

Thus, where the granting statute implements extensive regulatory oversight in the disbursement and use of public funds, courts have held that even the grantee entity is merely an agent of the government obligated to use public funds only for their designated use. Thus, when the grantee entity is in a bankruptcy proceeding, the public funds are not part of its bankruptcy estate unless the terms of the grant have been fulfilled. *See Joliet–Will*, 847 F.2d at 434–35 (grantee of federal funds is an intermediary performing a discrete task rather than a borrower free to exercise discretion in use of funds); *Westmoreland Human Opportunities*, 246 F.3d at 246 (following *Joliet–Will*.); *In re Comm. Assoc., Inc.*, 173 B.R. at 829 (same).

of the distributory scheme of the Bankruptcy Code. *See id.* However, the special nature of interests invoked where federal law specifically allocates federal funds to implement a particular public benefit merits special consideration.

For the same reason, the Court notes that the scope of this holding is narrow. This Court limits its application of federal common law to cases, as the one at bar, where extensive federal regulations and federal funds form the core of the issue in question. *See Sacred Heart Hosp.,* 175 B.R. at 559 (noting that courts apply a broader standard of constructive trusts where a governmental body and/or a federal statutory scheme is involved).

### C. The Bank as Bona Fide Purchaser

■ For the same reasons that the Reimbursements are not property the estate, they are not collateral of the Bank. The Bank argues that its status as a secured creditor renders the Bank a bona fide purchaser, whose rights are superior to those of a resulting or constructive trustee. *See CRS Steam,* 225 B.R. at 838. The Bank offered no evidence at trial as to the quantity or quality of its awareness of the existence of Reimbursements at any point in time. However, the Court need not delve into that question. The Bank's argument fails for another reason, namely, it is not a "purchaser" of a security interest in the Reimbursements.

The Bank did lend money to the Debtor and accordingly "purchased" a security interest in the Debtor's receivables within the meaning of Mass.Gen.Laws ch. 106 § 1–201(32) (2002).[13] Nevertheless, as set forth above, the Reimbursements are not

the Debtor's receivables. The Debtor's receivables were the $1,096,180.28 owed to the Debtor on the Central High School Project and the $134,000 owed to the Debtor on the Network Maintenance Project. Those amounts, clearly the Bank's collateral, were paid to the Debtor in full by the City. By virtue of the City's payment of the sums due to the Debtor, the proceeds of those receivables were incorporated in the Debtor's assets, some or all of which were and are also collateral of the Bank. However, it is illogical to presume that, by virtue of its loans to the Debtor, the Bank "purchased" a security interest in a payment which constituted a reimbursement by a third party to one of the Debtor's account debtors. Unquestionably, the Bank provided no value to the Debtor for any such "purchase."

### D. Jurisdiction to Compel the USAC Payment

■ Finally, this Court must consider USAC's argument that it is not subject to this Court's jurisdiction, insofar as the City requests that the Court order USAC to make the Reimbursements on a specific time frame. This Court agrees that it has no such jurisdiction.

The limits of this Court's jurisdiction are set forth in 28 U.S.C. § 1334(b) (2002). This Court may hear disputes which "arise under," "arise in" or are "related to" the Bankruptcy Code. The First Circuit Court of Appeals has recently distinguished these terms as follows:

> "[A]rising under" proceedings are (at least) those cases in which the cause of action is created by title 11.... "Arising in" proceedings generally are those that

---

**13.** Mass.Gen.Laws ch. 106, §§ 1–201(32)(33) provide:

(32) "Purchase" includes taking by sale, discount, negotiation, mortgage, pledge, lien, security interest, issue or re-issue, gift or any other voluntary transaction creating an interest in property.

(33) "Purchaser" means a person or his nominee who takes by purchase.

are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of bankruptcy. [*Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir.1987)]. "[R]elated to" proceedings [are] proceedings which "potentially have some effect on the bankruptcy estate, such as altering the debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankruptcy estate." *In re G.S.F. Corp.*, 938 F.2d 1467, 1475 (1st Cir.1991) (quoting *Smith v Commercial Banking Corp. (In re Smith)*, 866 F.2d 576, 580 (3d Cir.1989)).

*New England Power Marine, Inc. v. Town of Tyngsborough (In re Middlesex Power Equip. & Marine, Inc.)*, 292 F.3d 61, 68 (1st Cir.2002) (additional internal citations omitted).

This Court can draw on none of the above cited sources of jurisdiction to resolve the instant dispute between the City and USAC. The Reimbursements are not part of title 11 of the United States Code, but rather part of a federal statutory scheme contained in title 47 of the United States Code, the FCC regulations and USAC procedures. Accordingly, any cause of action relating thereto does not "arise under" title 11. Further, the rights surrounding the Reimbursements exist independently under non-bankruptcy law. Therefore, any dispute relating thereto would not "arise in" title 11. Finally, and perhaps ironically, having adopted the City's persuasive argument that the City has no claim against the Debtor on account of the Reimbursements, the Court is compelled to the conclude that any dispute between the City and USAC with respect to those funds would have no effect on the bankruptcy estate. Consequently, this Court has no "related to" jurisdiction over any such dispute.

## IV.   CONCLUSION

"Congress did not mean to authorize a bankruptcy estate to benefit from property that the debtor did not own." *Vineyard v. McKenzie (In re Quality Holstein Leasing)*, 752 F.2d 1009, 1013 (5th Cir.1985). The ownership rights in the Reimbursements are held by the City, not by the Debtor. Accordingly, the funds are available neither as collateral for the Bank, nor as a source of funds for a distribution to unsecured creditors.

For the reasons set forth above, the Court holds that the Reimbursements are not part of the Debtor's estate pursuant to § 541(d). This Court further rules that it has no jurisdiction to adjudicate any further dispute between the City and USAC.

A Judgment in conformance with this Memorandum of Opinion shall issue in conjunction herewith.

### *JUDGMENT*

For the reasons set forth in the Memorandum of Decision of even date, it is hereby

ORDERED, ADJUDGED and DETERMINED that:

1.  pursuant to and in accordance with 11 U.S.C. § 541(d), the funds in the amount of $1,070,056.74 (the "Funds"), payable to the Defendant Lan Tamers, Inc. (the "Debtor"), by the Defendant, Universal Service Administrative Company ("USAC"), is not property of the Debtor's estate; and

2.  no party in this adversary proceeding other than the Plaintiff, the City of Springfield, has any right or interest in the Funds; and

3.  the Debtor shall promptly remit the Funds to the Plaintiff upon receipt of the Funds from USAC; and

4. the Court is without jurisdiction under 28 U.S.C. § 1334 to grant the Plaintiff the further relief requested against the Defendant, USAC.